LISA LEONARD ROSE, Individually, and as Administratrix of the Estate of VIRGIL
LEE ROSE v. ISENHOUR BRICK & TILE CO., INC.

No. 448A95

(Filed 31 July 1996)

**Workers' Compensation § 62 (NCI4th)— Woodson claim
against employer—insufficient forecast of evidence**

Plaintiff's forecast of evidence was insufficient to establish a
*Woodson* claim for an employee's death when the carriage head of
a brick-setting machine descended and crushed the decedent as
he was leaning over the machine's spreader table where the fore-
cast tended to show that, instead of putting the machine in man-
ual to clear excess clay from the spreader table as contemplated
by the designer, defendant's operators were trained by manage-
ment to leave the machine in automatic and to hang weights on
wires from certain toggle switches so that the machine could
remain operational for production purposes and only selected
machine functions would stop; the machine operated by decedent
was in automatic at the time of the accident, but the evidence was
conflicting as to whether the switch controlling the head was
engaged with a weight and wire, and if so, whether the weight and
wire had slipped off the switch so that power was restored to the
carriage head; defendant employer was cited for OSHA violations
after decedent's death but had not previously been cited for any
violation with respect to the carriage head or the use of weights
and wires on this machine; the designer testified that it was not
unsafe to operate the machine by using weights and wires; no
specific regulations existed prior to this fatal accident which
required defendant to equip the carriage head with safety guards;
although plaintiff's expert testified that there was a high proba-
bility that an operator would be injured by the carriage head,
there was no evidence that defendant was aware of this probabil-
ity, and defendant's accident history does not bear out the
expert's probability calculations; defendant's employees had been
operating brick-setting machines with weights and wires for six
years prior to decedent's death, and no operator had previously
suffered a serious injury or death due to an accident involving the
carriage head; the head was painted reddish-orange and traveled
slowly along a fixed path; and the head warned of its approach by
making a noise and casting a shadow as it traveled. Plaintiff's
forecast of evidence was insufficient to establish that defendant

ROSE v. ISENHOUR BRICK & TILE CO.

[344 N.C. 153 (1996)]

employer knew its conduct was substantially certain to cause serious injury or death to its employee.

**Am Jur 2d, Workers' Compensation §§ 75 et seq.**

**What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

**Modern status: "dual capacity doctrine" as basis for employee's recovery from employer in tort. 23 ALR4th 1151.**

**Workers' compensation: injuries incurred during labor activity. 61 ALR4th 196.**

Appeal by plaintiff pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 120 N.C. App. 235, 461 S.E.2d 782 (1995), affirming an order granting defendant's motion for summary judgment entered by Helms (William H.), J., on 23 May 1994 in Superior Court, Rowan County. On 7 December 1995, the Supreme Court denied plaintiff's petition for discretionary review of an additional issue. Heard in the Supreme Court 9 April 1996.

*Wallace and Whitley, by Mona Lisa Wallace, for plaintiff-appellant.*

*Dean & Gibson, by Rodney Dean and Brien D. Stockman; and Harrell Powell, Jr., for defendant-appellee.*

*Patterson, Harkavy & Lawrence, by Burton Craige; and Twiggs, Abrams, Strickland & Trehy, by Douglas B. Abrams, on behalf of the North Carolina Academy of Trial Lawyers, amicus curiae.*

LAKE, Justice.

Virgil Lee Rose ("Rose"), an employee of Isenhour Brick & Tile Company ("defendant"), was killed while he was operating a brick-setting machine designated "machine number three" in defendant's brick manufacturing plant. Rose's wife, plaintiff Lisa Leonard Rose ("plaintiff"), individually and as the administratrix of Rose's estate, filed suit against defendant on 24 September 1991 seeking to recover compensatory and punitive damages for Rose's on-the-job death. Plaintiff's complaint included an allegation that Rose's death resulted from defendant's intentional training of its employees to bypass

ROSE v. ISENHOUR BRICK & TILE CO.

[344 N.C. 153 (1996)]

safety mechanisms provided by the machine manufacturer on dangerous equipment which defendant knew or should have known was substantially certain to cause serious injury or death to its employees.

On 13 July 1993, plaintiff voluntarily dismissed her individual claim against defendant. Defendant moved for summary judgment on 8 April 1994, and the trial court denied this motion in an order entered 19 April 1994. Defendant moved for reconsideration of this order based upon *Powell v. S & G Prestress Co.*, 114 N.C. App. 319, 442 S.E.2d 143 (1994), *aff'd*, 342 N.C. 182, 463 S.E.2d 79 (1995) (per curiam). On 23 May 1994, the trial court vacated its previous order and granted the defendant's motion for summary judgment. Plaintiff appealed, and in a divided opinion, the Court of Appeals affirmed. *Rose v. Isenhour Brick & Tile Co.*, 120 N.C. App. 235, 461 S.E.2d 782 (1995). Plaintiff appeals to this Court from the dissent filed in the Court of Appeals.

The issue presented for this Court's review is whether the Court of Appeals erred in affirming the trial court's entry of summary judgment in favor of the defendant. For the reasons which follow, we hold summary judgment was properly entered for the defendant, and therefore, we affirm the Court of Appeals.

The Workers' Compensation Act ("the Act") has traditionally provided the exclusive remedy for an employee accidently injured in the workplace. N.C.G.S. §§ 97-9, -10.1 (1991). However, in *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991), this Court carved out an exception to the Act's exclusivity rule and held:

> [W]hen an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct, that employee, or the personal representative of the estate in case of death, may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act.

*Id.* at 340-41, 407 S.E.2d at 228. Thus, in order for a plaintiff to maintain an action based upon *Woodson*, plaintiff must establish that defendant knew its conduct was substantially certain to cause serious injury or death to the employee.

Summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (1990). The moving party carries the burden of establishing the lack of any triable issue. *Roumillat v. Simplistic Enters.*, 331 N.C. 57, 414 S.E.2d 339 (1992). This burden may be met "by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Collingwood v. General Elec. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). All inferences of fact must be drawn against the movant and in favor of the nonmovant. *Id.*

In the present case, drawing all inferences of fact in favor of the plaintiff, as the nonmovant, the forecast of evidence tends to show the following facts and circumstances. Defendant manufactures and distributes brick and other related products. Rose was employed by defendant, and on 22 March 1990, Rose was asked by his foreman to operate brick-setting machine number three. Rose's regular job was to operate brick-making machine number three. However, he had been trained in the operation of brick-setting machine number three and had operated this particular setting machine before for a ten-week period. Rose had also operated this machine sporadically on other occasions as the need arose. At approximately 3:20 p.m., as Rose was leaning over the machine's spreader table attempting to clean excess clay from the table, the machine's head descended on Rose, crushing his head and shoulders. Rose died the next day from his injuries.

Brick-setting machine number three works in conjunction with brick-making machine number three. In this process, slugs, or uncut brick, are pushed through a very strong wire which cuts the slugs into individual bricks, at this point referred to as green brick. The green brick, through an automated process, is placed on the brick-setting machine's spreader table, and after the fourth row of green brick is in place, the spreader table spreads apart, causing the green brick to separate into rows. Once the spreader table is fully opened, the machine's head, which is attached to a carriage, descends by gravity onto the spreader table. The head has fingers which fit between the separated green brick. After air bags inflate to hold the green brick in place, the head ascends by power from the spreader table. The head travels approximately thirty feet along an overhead track, turns and

ROSE v. ISENHOUR BRICK & TILE CO.

[344 N.C. 153 (1996)]

deposits the green brick onto a waiting kiln car. The head then travels back to its home position above the spreader table, and the cycle repeats itself. It is estimated that the entire cycle takes one and a half minutes and that it takes five seconds for the head to descend once it is in position over the spreader table. The carriage head weighs approximately 3,000 pounds and is painted reddish-orange. A blower mounted onto the carriage head makes discernible noise, and because of its size, the head casts a shadow as it travels along its track.

Brick-setting machine number three was designed to operate in two modes: automatic and manual. There is also an emergency stop button. The machine's automatic mode was designed for production purposes; in automatic, all the functions of the machine operate continuously. The machine's manual mode was designed as a safety function; in manual, none of the machine's functions are continuously operational. The manual mode allows the operators to stop the machine functions so that such tasks as cleaning excess clay from the spreader table can be safely performed. In manual, the machine functions can be controlled individually through the use of two-position toggle switches located on the machine's control panel. Engaging a toggle switch while the machine is in manual allows that particular machine function to operate as necessary while the rest of the machine remains nonoperational. In automatic, however, engaging a toggle switch stops that particular function while the other functions remain operational. Because the toggle switches are spring-loaded, the toggle switch controlling a particular function of the machine must be held down in order to engage or disengage it.

Rather than putting the machine in manual to clean excess clay from the spreader table as contemplated by the designer, defendant's operators discovered that it was possible to leave the machine in automatic and hang a weight on a wire from certain toggle switches. This allowed the machine to remain operational for production purposes and only stop selected machine functions. Normally, operators hung a weight and wire on the carriage home switch, the head down switch and the spreader table closed switch. The slug reject switch, which was not a spring-loaded switch, was also engaged. In this configuration, the spreader table remained in an open position, but the carriage head was prevented from returning to its home position over the spreader table, and the head was prevented from descending to the spreader table. Engaging this combination of switches has the same effect as putting the machine in manual and allows the operator

to clean safely the excess clay from the spreader table. Some operators used weights and wires on different combinations of switches, and some operators used no weights and wires and simply tried quickly to remove the excess clay and "beat the head."

Defendant was aware its operators were running brick-setting machine number three in this manner. Indeed, operators were trained by management to leave the machine in automatic and use weights and wires when they needed to clean a small amount of clay from the spreader table. Defendant also trained its operators to put the machine in manual when they needed to clean a substantial amount of clay from the spreader table.

These weights and wires remained on the switches at all times, and duct tape was used to ensure the weights and wires would stay on the switches. At least two operators had a weight and wire fall off a switch while they operated brick-setting machine number three.

At the time of the accident, Rose was apparently attempting to clean excess clay from the spreader table. The machine was in automatic, and only the spreader table closed switch was engaged with a weight and wire. There are conflicting statements as to whether the switch controlling the head was engaged with a weight and wire, and if so, whether the weight and wire slipped off the switch, thereby restoring power to the head and allowing it to descend upon Rose.

An Occupational Safety and Health Administration ("OSHA") investigation into Rose's death and a hearing before Administrative Law Judge Carroll Tuttle resulted in citations against defendant for serious violations of 29 C.F.R. § 1910.212(a)(3)(ii) and of N.C.G.S. § 95-129(1). The OSHA investigator concluded in her report that the causal factors of Rose's death were the "improper use of machine controls (not operating machine according to manufacturer[']s design) and lack of machine guards or guarding devices."

John G. Buckner, president of Auto Systems and Service, designed brick-setting machine number three for defendant, and although he indicated that the switches were not designed to be used with weights and wires, he saw nothing unsafe about operating the machine in this manner. Buckner had not seen weights and wires used on similar machines in other companies, but he was aware of companies that used vise grips and magnets to hold toggle switches down while the machine was in the automatic mode. No written

operator's manual was provided by Auto Systems and Service for brick-setting machine number three.

The Court of Appeals, in holding that the plaintiff's forecast of evidence was insufficient to overcome defendant's motion for summary judgment, relied upon the following example taken from the Restatement (Second) of Torts as illustrative of the misconduct required to satisfy *Woodson's* substantial certainty test:

> A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

Restatement (Second) of Torts § 8A illus. 1 (1965). However, as we did in *Mickles v. Duke Power Co.*, 342 N.C. 103, 463 S.E.2d 206 (1995), we disavow this example since in it, "A is *actually* certain his act will injure or kill C. A successful claim under the *Woodson* exception does not require such actual certainty." *Id.* at 110, 463 S.E.2d at 211.

We nevertheless agree with the Court of Appeals that in this case, the plaintiff's forecast of evidence was insufficient to overcome defendant's motion for summary judgment, as the evidence did not demonstrate that defendant knew its conduct was substantially certain to cause serious injury or death to Rose. As the Court of Appeals noted, defendant had never been cited for an OSHA violation with respect to either the carriage head or the use of weights and wires on brick-setting machine number three. Moreover, no specific regulations existed prior to this fatal accident which required defendant to equip the carriage head with safety guards. Plaintiff's expert indicated that according to his probability calculations, the chance of an operator suffering death or serious injury was between 77.3 and 93.1 percent. Yet no evidence shows that defendant was aware, prior to Rose's death, of the high probability that an operator would be injured by the carriage head. Indeed, defendant's accident history fails to bear out plaintiff's expert's probability calculations. Defendant's employees had been operating brick-setting machine number three with weights and wires for approximately six years prior to Rose's death, and in all this time, no operator of brick-setting machine number three suffered a serious injury or death due to an accident involving the carriage head. Further, the head, a massive piece of machinery, was painted reddish-orange and traveled slowly along a fixed path. The head made noise, generated from the blower

attached to the carriage, and cast a shadow as it traveled, thus warning of its approach.

Based on the forecast of evidence in this case, we agree with the Court of Appeals that after drawing all inferences of fact in favor of the plaintiff, no genuine issues of material fact exist and that the defendant is entitled to judgment as a matter of law. Therefore, we conclude that summary judgment was properly entered in favor of the defendant.

For the foregoing reasons, the decision of the Court of Appeals is affirmed.

AFFIRMED.