**Linda ALLEN and Julie Ord Plaintiffs,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 1:02 CV 01121.**

United States District Court, M.D. North Carolina.

March 1, 2004.

relief includes a request for injunctive relief under trademark law, 15 U.S.C. § 1116.

639

favorable to Plaintiffs, claims that IBM knowingly engaged in activities that it knew were substantially certain to cause severe injury or death. Plaintiffs have also alleged that IBM's alleged misconduct in fact caused Plaintiffs to suffer severe and permanent health problems. Plaintiffs thus contend that they are able to pursue a civil claim against IBM based on the exception to the exclusivity provisions of the North Carolina Workers' Compensation Act set forth by the North Carolina Supreme Court in *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222 (1991). In connection with their claims, Plaintiffs also sought a temporary restraining order and a preliminary injunction against IBM.

Currently before the Court, therefore, are IBM's Motion to Dismiss [Document # 2], Plaintiffs' Memorandum in Opposition to the Defendant's Motion to Dismiss and Request for a Temporary Restraining Order and Preliminary Injunction [Document # 4], and Plaintiffs' Motion for Leave of Court to Amend Their Complaint [Document # 5] (hereinafter "Motion to Amend").

Brenton D. Adams, Dunn, NC, Kenneth F. McCallion, McCallion & Associates, L.L.P., New York, NY, for Plaintiff.

Charles Matthew Keen, Robert A. Sar, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Raleigh, NC, for Defendant.

### MEMORANDUM OPINION

BEATY, District Judge.

Plaintiffs Linda Allen ("Allen") and Julie Ord ("Ord") (collectively "Plaintiffs") bring claims against their former employer, Defendant International Business Machines Corporation ("IBM" or "Defendant"), for health problems Plaintiffs allege they have suffered due to IBM's misconduct. Specifically, Plaintiffs' Amended Complaint[1] [Document # 5], viewed in the light most

### I. FACTUAL BACKGROUND

Viewing the allegations in the light most favorable to Plaintiffs, as the Court must do in the context of a Motion to Dismiss, on May 1, 2000, Plaintiffs were Senior Financial Analysts employed with IBM in Building 061, located at 3039 Cornwallis Road, Research Triangle Park, North Carolina. Prior to May 1, 2000, Building 061 had experienced numerous roof leaks and floods due to problems with the building's plumbing. During the weekend of April 29–30, 2000, a pipe burst, flooding Building 061 with approximately 30,000 gallons of water. Plaintiffs allege, however, that

---

**1.** As discussed more fully in Section II below, the Court will grant Plaintiffs' Motion to Amend. Therefore, the Court's exposition of

the facts is based on the allegations in Plaintiffs' Amended Complaint [Document # 5].

IBM did not remove the water-damaged materials from Building 061 until May 5, 2000. Therefore, throughout the week of May 1–5, 2000, employees had to walk over wet carpets and were surrounded by water-damaged wallboard, ceiling tiles, and other materials. On May 5, 2000, the Research Triangle Institute ("RTI") received bulk building-material samples and indoor air-quality samples from Building 061. RTI analyzed these samples and on July 10, 2000, issued a report to IBM stating that the samples were contaminated with toxic mold.

Because of the extensive damage, IBM relocated those employees whose offices were flooded. Plaintiffs' offices, however, were not flooded. In fact, Allen's office was approximately three aisles away from the flooded area and Ord's office was approximately one aisle away from the flooded area. Therefore, Plaintiffs were not relocated. During the seven-month period in which IBM was renovating Building 061, Plaintiffs continued to work in their offices in that building. After the flooding, Plaintiffs allege that they "began to suffer from constant vertigo, extreme sensitivity to motion and visual stimuli, chronic fatigue, muscle spasms, suppressed immune systems, and significant cognitive disorders." (Am. Compl. ¶ 18 [Document # 5].) Plaintiff Ord's symptoms worsened more rapidly than Allen's, and in June 2000, she was experiencing constant vertigo, which led to her doctor ordering her not to return to work. However, both Plaintiffs continued to work in Building 061.

On November 7, 2000, after learning of other employees who were experiencing similar symptoms, Plaintiffs requested that IBM investigate the problem. IBM agreed, and on November 16, 2000, IBM conducted an inspection of the facility. The inspection was performed by several IBM employees. The inspection team consisted of Tim Hitchcock ("Hitchcock"), who was responsible for Indoor Air Quality and Safety, Ken Slater, who was responsible for Maintenance, and Jennifer Thomason ("Thomason"), who was a Nurse Case Manager. Before the inspection, Ord informed Thomason that she was concerned that toxic mold had caused her physical ailments. Thomason, however, felt confident that there were no mold problems in the building that were related to Ord's concerns. Thomason further informed Ord that if only three employees in the building were sick, there was not a mold problem. Allen also informed Hitchcock of her concerns about toxic mold. Hitchcock informed Allen that toxic mold had occurred in the same location in a different building and that he would be able to identify the mold with a visual inspection. During the inspection, the inspectors tested for temperature, carbon dioxide, and humidity. Therefore, beyond this mere walkthrough inspection, no specific testing for mold was performed. Further, Plaintiffs allege that the inspection team's walkthrough inspection only covered approximately fifteen percent of the building.

After November 2000, Ord was no longer able to continue working at IBM. However, Allen was able to continue working, and on November 27, 2000, at Thomason's request, Allen completed a medical evaluation form for Dr. Karen Dunn and underwent allergy testing. On December 6, 2000, a copy of Allen's allergy-test results was sent to Thomason. On that same day, Dr. Dunn requested that Allen be removed from the building for six weeks to determine whether Building 061 was causing Allen's ailments. Thomason, however, denied Dr. Dunn's request, stating that an IBM doctor had reviewed the information regarding Allen's physical problems. Therefore, Thomason advised Allen that she did not see any medical reason for Allen to be transferred out of the building. Nevertheless, Allen's symptoms continued

to worsen, and on July 6, 2001, she was no longer able to work.

On March 11, 2002, after reviewing the report prepared by RTI, Dr. Eckardt Johanning diagnosed the cause of Plaintiffs' medical conditions as exposure to indoor toxic mold at IBM Building 061. In July 2002, IBM experienced additional water damage in another employee's office. Plaintiffs contend that it is significant that the IBM employee who repaired this damage wore a HAZMAT suit while repairing this additional water damage.

## II. PROCEDURAL HISTORY

On December 19, 2002, Plaintiffs filed the present suit against IBM in the Superior Court of Durham County based upon their allegations of severe health problems related to the water damage to Building 061. (Compl. [Document # 1].) Pursuant to 28 U.S.C. §§ 1441(a) and 1446, Defendant removed the matter to this Court on the basis of diversity because Plaintiffs are residents of North Carolina and IBM is incorporated in the state of New York and its principal place of business is in Armonk, New York. (Notice Removal [Document # 1] ¶¶ 1–2.) Because there is diversity of citizenship and the amount in controversy, exclusive of interest and costs, is greater than $75,000, this matter is properly before this Court. *See* 28 U.S.C. § 1332(a).

On December 27, 2002, Defendant filed a Motion to Dismiss. The primary argument Defendant made supporting its Motion to Dismiss was that Plaintiffs' lawsuit was barred by a one-year statute of limitations. (*See* Def.'s Mem. Law Supp. Mot. Dismiss [Document # 3].) In a footnote to its Memorandum of Law, Defendant also briefly argued that even if the one-year statute of limitations period did not apply, Plaintiffs had still failed to allege cognizable *Woodson* claims. (*See id.* at 6 n. 2.) Plaintiffs filed their response brief on Feb-

ruary 10, 2003. (Pls.' Mem. Opp. Def.'s Mot. Dismiss & Req. T.R.O. & Prelim. Inj.) In the response brief, Plaintiffs primarily argued that a three-year, not a one-year, statute of limitations applies to their claims. (*Id.*) Plaintiffs also briefly addressed Defendant's arguments that Plaintiffs had failed to state cognizable *Woodson* claims. (*Id.* at 5–7.) Also on February 10, 2003, Plaintiffs filed a Motion to Amend moving the Court to allow them to amend their Complaint "to clarify the date that the cause of action accrued against the Defendant." (Mot. Am. at 1.) Defendant then filed its Reply Brief [Document # 7] to Plaintiffs' Memorandum in Opposition to the Defendant's Motion to Dismiss and Request for a Temporary Restraining Order and Preliminary Injunction. In its Reply Brief, Defendant first argued, under Local Rule 7.3(f), that Plaintiffs' response to its Motion to Dismiss was filed late and that the Court should therefore disregard it. (Reply Br. at 1.) Defendant again argued that a one-year statute of limitations applies to Plaintiffs' claims. (*Id.* at 2–8.) Defendant also expanded its argument that even if Plaintiffs' claims were not barred by the statute of limitations, Plaintiffs' Complaint failed to state the elements of a *Woodson* claim and therefore should be dismissed on that ground. (*Id.* at 8–10.) On March 3, 2003, Defendant responded to Plaintiffs' Motion to Amend, arguing that the Motion should be denied as futile. (Def.'s Mem. Opp. Pls.' Mot. Am. [Document # 8].)

However, based upon the North Carolina Supreme Court's decision in *Alford v. Catalytica Pharms., Inc.*, 356 N.C. 654, 577 S.E.2d 293 (2003) (per curiam), Defendant has conceded, and this Court agrees, that a three-year statute of limitations applies to *Woodson* claims. *See Alford,* 356 N.C. at 655, 577 S.E.2d at 293 (citing *Alford v. Catalytica Pharms., Inc.*, 150 N.C.App. 489, 495–97, 564 S.E.2d 267, 271–

72 (2002) (Thomas, J., dissenting)). Therefore, Defendant filed a Notice of Subsequently Decided Authority and Partial Withdrawal of Motion to Dismiss and Withdrawal of Opposition to Motion to Amend [Document #9] (hereinafter "Withdrawal Notice"). Within this document, Defendant withdrew its opposition to Plaintiffs' Motion to Amend and withdrew its previous arguments that Plaintiffs' claims are barred by the statute of limitations. Further, in the Withdrawal Notice, Defendant noted that "the sole issue remaining to be addressed in Defendant's Motion to Dismiss is whether ... the Complaint fails because the Plaintiffs have not plead facts sufficient to establish 'substantial certainty of the likelihood of serious injury or death' as is required of a '*Woodson* claim.'" (Withdrawal Notice at 1–2.) Plaintiffs then filed their Memorandum in Opposition to the Defendant's Motion to Dismiss [Document #10], which addresses the issue of whether Plaintiffs' Amended Complaint is sufficient under *Woodson.*

In summary, therefore, the Court will, in its discretion, consider Plaintiffs' Memorandum in Opposition to the Defendant's Motion to Dismiss and Request for a Temporary Restraining Order and Preliminary Injunction, even though this Motion failed to comply with Local Rule 7.3(f). Further, because Plaintiffs' and Defendant's initial arguments focused on the statute-of-limitations question, which is now moot, as opposed to the substantive question of whether Plaintiffs' allegations are sufficient to make out a *Woodson* claim, which is now ripe for adjudication, the Court will consider the arguments in Defendant's Motion to Dismiss and Reply Brief, even though they only briefly address the substantive question of liability. The Court will also consider Plaintiffs' arguments in their Memorandum in Opposition to Defendant's Motion to Dismiss that they have alleged sufficient facts to make out a *Woodson* claim. Further, because Defendant does not oppose Plaintiffs' Motion to Amend and will not be prejudiced by the Court granting Plaintiffs' Motion to Amend, the Court will grant Plaintiffs' Motion to Amend. Therefore, the Court's ruling on Defendant's Motion to Dismiss will be based on the allegations set forth in Plaintiffs' Amended Complaint.

## III. DEFENDANT'S MOTION TO DISMISS

### A. Motion to Dismiss Standard

With respect to a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, dismissals are allowed "only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989). Generally, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002) (internal quotations omitted); *accord Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). Thus, the purpose of a motion to dismiss is to test the legal sufficiency of the complaint and not the facts that support it. *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989) (internal quotations omitted).

## B. Discussion

■ IBM moves this Court to dismiss Plaintiffs' claims that IBM intentionally engaged in conduct that it knew was substantially certain to cause serious injury or death to Plaintiffs and which conduct Plaintiffs allege did in fact cause them to experience serious health problems. Specifically, Plaintiffs claim that IBM knowingly subjected Plaintiffs to hazardous working conditions, that is, the toxic mold in Building 061. As discussed above, Plaintiffs bring their claims pursuant to *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222 (1991). In North Carolina, the Workers' Compensation Act generally requires employees to bring claims against their employers arising out of workplace-related injuries pursuant to the provisions of the Act and thus forbids employees from instituting separate civil suits against their employers. *See* N.C. Gen.Stat. §§ 97–9 & –10.1. In *Woodson v. Rowland,* however, the North Carolina Supreme Court recognized an exception to the exclusivity provisions of the Workers' Compensation Act and thereby allowed civil actions against an employer for situations in which the "employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct ...." *Woodson,* 329 N.C. at 340, 407 S.E.2d at 228. In defining "substantial certainty," the North Carolina Court of Appeals later explained that "[s]ubstantial certainty is more than a possibility or substantial probability of serious injury but is less than actual certainty." *Regan v. Amerimark Bldg. Prods., Inc.,* 127 N.C.App. 225, 227, 489 S.E.2d 421, 423 (1997), *aff'd per curiam,* 347 N.C. 665, 496 S.E.2d 378, *reh'g denied,* 348 N.C. 509, 502 S.E.2d 852 (1998). The North Carolina Supreme Court in *Woodson* reasoned that "[s]uch misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act." *Id.* at 341, 407 S.E.2d at 228. Therefore, if the employer's misconduct meets the standard set forth in *Woodson,* the employee may bring both a civil claim and a workers' compensation claim against the employer, although the employee is limited to one recovery. *Id.* at 340–41, 407 S.E.2d at 228.

Thus, the starting point for the Court's consideration of Plaintiffs' *Woodson* claims is an examination of the facts of *Woodson* itself. The facts in *Woodson* were particularly egregious. In *Woodson,* Davidson & Jones, Inc. ("Davidson & Jones") hired Morris Rowland Utility, Inc., ("Rowland Utility"), the decedent's employer, to dig a sewer line. *Id.* at 334, 407 S.E.2d at 225. The day before the accident, both Davidson & Jones and Rowland Utility had employees working on the sewer line in separate trenches. *Id.* at 335, 407 S.E.2d at 225. Davidson & Jones was using a trench box in its trench to prevent its trench from caving in. *Id.* Rowland Utility, however, had not sloped, shored, or braced its trench, nor did it use a trench box to prevent the trench from collapsing. *Id.* Rowland Utility's failure to take such safety precautions violated the Occupational Health and Safety Act of North Carolina. *Id.* The next day, because the Davidson & Jones crew did not work, Morris Rowland, the president and sole shareholder of Rowland Utility, discussed with his foreman whether they should use the Davidson & Jones trench box in their trench, but they decided not to. *Id.* Later that morning, one side of the trench collapsed, burying the decedent. *Id.* at 336, 407 S.E.2d at 225. By the time his coemployees could remove him, he was dead. *Id.* at 336, 407 S.E.2d at 226.

In denying summary judgment for Rowland Utility, the North Carolina Supreme Court held that

Morris Rowland's knowledge and prior disregard of dangers associated with trenching; his presence at the site and opportunity to observe the hazards; his direction to proceed without the required safety procedures; [the Davidson & Jones foreman's] experienced opinion that the trench was unsafe; and [the plaintiff's expert's] scientific soil analysis converge to make plaintiff's evidentiary forecast sufficient to survive Rowland Utility's motion for summary judgment. *Id.* at 346, 407 S.E.2d at 231–32. The North Carolina Supreme Court further noted that Rowland Utility had been cited four times in the preceding six-and-a-half years for violations of safety regulations governing trenching. *Id.* at 335 n. 1, 407 S.E.2d at 225 n. 1. Under these facts, therefore, the North Carolina Supreme Court held that a reasonable jury could conclude that the decedent's "death was the result of intentional conduct by his employer which the employer knew was substantially certain to cause serious injury or death . . . ." *Id.* at 337, 407 S.E.2d at 226.

Since the North Carolina Supreme Court established the *Woodson* exception to the exclusivity provisions of the Workers' Compensation Act, however, no plaintiff has successfully brought a *Woodson* claim. *See Whitaker v. Town of Scotland Neck,* 154 N.C.App. 660, 663, 572 S.E.2d 812, 814 (2002) (stating that "[b]efore this case, no claim has been brought successfully under the *Woodson* exception"), *rev'd,* 357 N.C. 552, — S.E.2d — (2003), *reh'g denied,* 358 N.C. 159, 593 S.E.2d 591, N.C. LEXIS 58 (N.C.2004). Thus, the North Carolina Supreme Court and the North Carolina Court of Appeals have created an extremely demanding standard for plaintiffs bringing *Woodson* claims. However, in *Whitaker v. Town of Scotland Neck,* the North Carolina Court of Appeals found that the plaintiffs had demonstrated a genuine issue of material fact with respect to

their *Woodson* claim. In *Whitaker,* the plaintiffs sued on behalf of the decedent, who was killed while operating a garbage truck for the Town of Scotland Neck. *Whitaker,* 154 N.C.App. at 660–61, 572 S.E.2d at 812–13. The decedent's death was caused by a defective latching device on the garbage truck that violated North Carolina safety regulations. *Id.* at 661, 572 S.E.2d at 813. Because the latching device was defective, when the garbage-truck crew was lifting a dumpster into the air to empty it into the truck, the dumpster swung loose and pinned the decedent against the side of the truck, killing him. *Id.* at 661, 572 S.E.2d at 812–13. Further, there was evidence that a similar incident had occurred three weeks earlier but no one was injured and the town did not repair the defect. *Id.* at 661, 572 S.E.2d at 813. In denying summary judgment, the court of appeals applied a six-factor test it had previously articulated in *Wiggins v. Pelikan, Inc.,* 132 N.C.App. 752, 756–58, 513 S.E.2d 829, 832–33 (1999), to determine that the plaintiffs had demonstrated a genuine issue of material fact that the defendant knew that there was a substantial certainty that an employee could be killed or seriously injured in the manner in which the decedent was killed. *Whitaker,* 154 N.C.App. at 663–64, 572 S.E.2d at 814.

The North Carolina Supreme Court granted discretionary review in *Whitaker* and reversed the decision of the court of appeals. *Whitaker v. Town of Scotland Neck,* 357 N.C. 552, 558 (2003). The North Carolina Supreme Court first held that the *Wiggins* six-factor test "misapprehends the narrowness of the substantial certainty standard set forth in *Woodson v. Rowland.*" *Id.* at 555–56. The court therefore "explicitly reject[ed] the *Wiggins* test and rel[ied] solely on the standard originally set out . . . in *Woodson v. Rowland.*" *Id.* at 556. The court explained that a claim under *Woodson* is only cogni-

zable "in the most egregious cases of employer misconduct." *Id.* at 557. For a plaintiff to prevail on a *Woodson* claim, therefore, there must be "uncontroverted evidence of the employer's intentional misconduct" and that "misconduct [must be] substantially certain to lead to the employee's serious injury or death." *Id.* The court noted that in *Woodson,* the hazards were "obvious" and the defendant-employer's president observed them first-hand; the employer's president "disregarded all safety measures"; the employer's president "intentionally placed his employee into a hazardous situation in which experts concluded that" a cave-in was substantially certain to occur; the defendant was "manifestly indifferent to the health and safety of [its] employees"; the defendant "had been previously cited for multiple, significant violations of safety regulations"; the decedent was "expressly instructed into an obviously hazardous situation"; and the decedent "worked in a deep, narrow trench in which it was impossible for him to escape or avoid injury once the soil around him began to cave in." *Id.* at 557–58. The court further noted that in *Woodson* the defendant "recognized the immediate hazards of his operation and consciously elected to forgo critical safety precautions." *Id.* at 558. After evaluating the facts of *Woodson* and comparing them to the facts before it in *Whitaker,* the court concluded that the plaintiffs in *Whitaker* failed to demonstrate a genuine issue of material fact that the defendants were civilly liable under *Woodson. Id.*

■ Applying the standard articulated in *Woodson* to the allegations in Plaintiffs' Amended Complaint, this Court finds, particularly in light of the North Carolina Supreme Court's decision in *Whitaker,* that Plaintiffs have failed to state claims that IBM intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death to Plaintiffs. Based on the allegations in Plaintiffs' Amended Complaint, the Court finds that Plaintiffs will be unable to prove any set of facts to make out their *Woodson* claims. In the present case, viewing the allegations in the light most favorable to Plaintiffs, it is clear that the alleged hazards due to toxic mold were not "obvious" to Defendant in the sense that the North Carolina Supreme Court has used that term in connection with *Woodson* claims. Even accepting Plaintiffs' view that IBM was aware of the presence of toxic mold in Building 061, the Court nevertheless finds that Plaintiffs' allegations fail to show that the dangers of severe injury or death due to toxic mold were obvious to IBM. Plaintiffs argue that the fact that IBM sent a worker in a HAZMAT suit in July 2002 to remove toxic-mold-covered materials supports the inference that IBM knew that toxic mold was substantially certain to cause severe health problems. Such allegations, however, fail to show that IBM knew from May 2000 to July 2001, the dates relevant to Plaintiffs' causes of action, of the hazards of toxic mold. At most, these allegations show that IBM was taking additional safety precautions in July 2002, not that it knew that it was taking inadequate safety precautions in 2000. The Court notes that, with respect to *Woodson* claims, the North Carolina Supreme Court has narrowly defined the term "obvious." In *Whitaker,* the court found that the defendant did not subject the decedent to an obvious hazard when it failed to repair a defective latch on a garbage truck that it knew was defective and that it knew had previously resulted in the same type of accident that killed the decedent. Plaintiffs' allegations that IBM took additional safety precautions in July 2002 are even less probative than the evidence in *Whitaker* that the defendant had actual knowledge of the danger of the defective latch. Thus, Plaintiffs' case is even weaker than the plaintiffs' case in *Whitaker,* in

which the North Carolina Supreme Court granted summary judgment to the defendant. In summary, therefore, Plaintiffs' case is much different from *Woodson*, where the hazards of sending men into the unsloped, unshored, and unbraced trench without a trench box were clear to the defendant, who disregarded them nonetheless.

In addition, unlike in *Woodson*, Defendant did not violate any safety regulations nor are there any allegations that any safety standards related to toxic mold even exist. Nevertheless, Plaintiffs contend that while "[i]t may be true that the Defendant did not violate any safety standards, . . . that is only because there were none in place." (Pls.' Mem. Opp. Def.'s Mot. Dismiss at 6.) However, Plaintiffs' arguments that safety standards relating to toxic mold should be enacted actually hurt Plaintiffs' claims because these arguments suggest that Defendant did know that toxic mold was substantially certain to cause severe injury or death. Defendant's lack of previous violations of safety regulations distinguishes this case from *Woodson*, as does the absence of "specific regulations" requiring Defendant to protect its employees from the dangers of toxic mold. *See Rose v. Isenhour Brick & Tile Co.*, 344 N.C. 153, 159, 472 S.E.2d 774, 778 (1996).

Further, viewing Plaintiffs' allegations in the light most favorable to Plaintiffs, the allegations fail to show that IBM "recognized the immediate hazards of [its conduct] and consciously elected to forgo critical safety precautions" or that IBM "disregarded all safety measures." *Whitaker*, 357 N.C. at 557–58. In fact, the allegations prove otherwise. Approximately five days after the pipe burst, IBM began removing mold-covered materials from the building and renovated the building over the next seven months. (Am. Compl. ¶¶ 10–11, 15.) Further, nine days after Plaintiffs requested IBM to investigate the cause of their illnesses, IBM conducted an inspection of the building. (*Id.* ¶¶ 22–27.) In addition, Nurse Thomason showed interest in Plaintiff Allen's claim by advising Allen to undergo a medical evaluation, which Thomason reviewed with an IBM doctor. (*Id.* ¶¶ 28–30.) Thus, while Plaintiffs contend that IBM should have done more, that is, IBM should have removed the flooded materials more quickly, IBM should have relocated more employees (including Plaintiffs), IBM should have conducted a more thorough inspection of the premises, and IBM should have followed the recommendations of Plaintiff Allen's (as opposed to IBM's) doctor, these contentions fail to meet the *Woodson* standard for employer liability. While Plaintiffs' allegations might state negligence claims against IBM, they do to show that IBM knew that its actions with respect to Plaintiffs were substantially certain to cause Plaintiffs to experience severe illnesses.

As discussed above, a claim under *Woodson* is only cognizable "in the most egregious cases of employer misconduct." *Id.* at 557. The allegations in Plaintiffs' Amended Complaint fall well short of the level of egregiousness present in *Woodson*, in which the defendant violated specific safety regulations, had previously been cited for the same safety violations, and still ordered the decedent into the trench knowing that there was a substantial certainty that it would collapse and either severely injure or kill the decedent. As the North Carolina Supreme Court held in *Whitaker*, "[t]he *Woodson* exception represents a narrow holding in a fact-specific case," *id.*, and even viewing the allegations in Plaintiffs' Amended Complaint in the light most favorable to Plaintiffs, as this Court must do, Plaintiffs can prove no set of facts consistent with their allegations that would be sufficient to make out a *Woodson* claim. For the foregoing rea-

sons, therefore, Defendant's Motion to Dismiss Plaintiffs' claims as stated in their Amended Complaint is granted.

## IV. PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

■ The final matter before the Court, therefore, is Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction (hereinafter "Plaintiffs' Request"), which Plaintiffs included as part of their Memorandum in Opposition to the Defendant's Motion to Dismiss and Request for a Temporary Restraining Order and Preliminary Injunction. Plaintiffs request that the Court enjoin IBM from continued removal of allegedly mold-covered materials, which Plaintiffs contend they need to examine to pursue their claims against IBM. In its Reply Brief, Defendant contends that Plaintiffs' Request violates the Local Rules of this district. Notwithstanding Defendant's contentions that Plaintiffs have committed procedural errors in making their Request for a Temporary Restraining Order and Preliminary Injunction, the Court will, with respect to Plaintiffs' request for a preliminary injunction,[2] nevertheless consider Plaintiffs' Request on the merits. The Court notes that a preliminary injunction is "an extraordinary remedy . . . to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991) (second alteration in original) (internal quotations omitted). In determining whether to grant or deny a preliminary injunction, the Court must consider four factors: (1) the plaintiff's likelihood of success on the merits of the underlying dispute; (2) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (3) the likelihood of harm to the defendant if the injunction is issued; and (4) the public interest. *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 192–93, 196 (4th Cir.1977). As discussed above, the Court has granted Defendant's Motion to Dismiss for failure to state a claim. Therefore, based upon the Court's ruling on Plaintiffs' *Woodson* claims, it is clear that Plaintiffs cannot prevail on the merits of their claims. Further, to grant a preliminary injunction under these circumstances would cause greater harm to Defendant than to Plaintiffs given the Court's ruling on the substantive issue before the Court. In addition, there would be no public interest served by granting a preliminary injunction under the circumstances of this case. Furthermore, as a practical matter, any injunctive relief now would likely be ineffectual due to the substantial likelihood that IBM had already removed the toxic-mold-covered materials from the facility by the time this matter was submitted to this Court for consideration. For the foregoing reasons, therefore, Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction is denied.

## V. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion to Amend is granted. Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is also granted. Further, Plaintiffs' Request for a Temporary Restraining Order and a Preliminary Injunction is denied. An Order and Judgment consistent with this Memorandum Opinion shall be filed contemporaneously herewith.

---

**2.** Although Plaintiffs initially requested a temporary restraining order in addition to a preliminary injunction, the Court finds that the passage of time has diminished the effectiveness of the issuance of a T.R.O. The Court therefore will address injunctive relief only in terms of whether such relief is available in the form of a preliminary injunction.

*ORDER AND JUDGMENT*

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Amend [Document # 5] is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant's Motion to Dismiss [Document # 2] is GRANTED.

Finally, IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction [Document # 4] is DENIED.

Accordingly, Plaintiffs' claims against IBM are hereby DISMISSED with prejudice.