**Terry RICHMOND, Administrator of the Estate of Timothy Richmond, Deceased, Plaintiff,**

v.

**INDALEX INC., Novar Inc., and Novar PLC, Defendants.**

No. 1:02 CV 01036.

United States District Court, M.D. North Carolina.

March 9, 2004.

Octavis White, Jr., George E. Hunt, Hunt & White, Graham, NC, Thomas F. Ramer, Ganly Ramer & Strom, Asheville, NC, for Plaintiff.

Richard T. Rice, Reid Calwell Adams, Jr., Bradley Owen Wood, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for Defendant.

## MEMORANDUM OPINION .

BEATY, District Judge.

Plaintiff Terry Richmond ("Plaintiff" or "Administrator"), administrator of the estate of Timothy Richmond ("Richmond"), brings wrongful-death claims against Defendant Indalex Inc. ("Indalex") and Defendants Novar Inc. and Novar plc (collectively "Novar" or the "Novar Defendants") arising out of the on-the-job death of Timothy Richmond. Specifically, Plaintiff's Complaint [Document # 1], viewed in the light most favorable to Plaintiff, claims that Indalex knowingly engaged in activities that were substantially certain to cause severe injury or death and these activities in fact caused the death of its employee Richmond. Plaintiff. thus contends that it may bring a civil claim against Indalex based on the *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991), exception to the exclusivity provisions of the North Carolina Workers' Compensation Act. Plaintiff further claims that the Novar Defendants are parent companies of Indalex and are derivatively liable for Indalex's wrongful actions or alternatively that, if not derivatively liable, Novar is independently liable for its own negligent acts that resulted in Richmond's death. Defendants have filed several motions in response to Plaintiff's claims. Currently before the Court are Novar's Motion to Dismiss [Document # 18], Indalex and Novar's (collectively "Defendants") Motion for Summary Judgment [Document # 38], and Defendants' Motion to Strike Plaintiff's Response to Indalex's Suggestion of Subsequently Decided Authority and Addendum to Plaintiff's Brief in Opposition (hereinafter "Motion to Strike") [Document # 54].

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As it must in the context of a Rule 56 Motion for Summary Judgment, the Court views the evidence in the light most favorable to Plaintiff, granting Plaintiff the benefit of all reasonable inferences. The Court will therefore restate the facts of this case in accordance with this standard.[1]

---

1. The Court notes that it is considering both Novar's Motion to Dismiss and Indalex's Motion for Summary Judgment. Therefore, when ruling on Novar's Motion to Dismiss, the Court will view the allegations of Plaintiff's Complaint in the light most favorable to Plaintiff. However, the facts relevant to

The evidence thus shows that Decedent Timothy Richmond was employed at Defendant Indalex's Burlington, North Carolina, facility as a tail stretcher on Press No. 1, which is an aluminum extrusion machine. Press No. 1 extrudes lengths of aluminum flat bar onto a material handling system. This flat bar is approximately 120′ long by 4″ wide by 1/2″ thick and weighs approximately 120 pounds. The material handling system on Press No. 1 consists of a hot side (also known as the "cooling table"), on which the aluminum is extruded and cooled. Once cooled, the material handling system is designed to automatically use a series of belts and walking arms to move the extruded aluminum product to the stretcher. The aluminum product is then clamped into the head stretcher and tail stretcher where it is stretched. Once the stretching process is complete, the material handling system is designed to automatically release the stretched metal bar on the cold side (also known as the "transfer table" or "saw batch table"), with another series of belts moving the aluminum to the saw in-feed table. Then the system is designed so that one long conveyor belt moves the aluminum product to a saw, where it is cut to customer specifications.

When functioning properly, employees would not have to touch or manually move the aluminum while it was on the transfer table. However, both before and at the time of Richmond's accident, the material handling system was not functioning properly. Therefore, employees would use shepherd's hooks and even their hands to keep the aluminum moving through the machine. To manually move the aluminum through the machine, the employees had to stand next to unguarded parts of the machine where, if the machine had

been functioning properly, they would not have been permitted to stand. Indalex supervisors informed management on numerous occasions about the possible dangers the problems with Press No. 1 and its material handling systems posed to Indalex employees. Further, the saw operator routinely placed a measuring tape on top of the foot pedal that controlled the rotating shaft on which Richmond's coat was caught, which allowed for continuous operation of the machine without the need for an employee to manually operate the foot pedal. However, without an employee continuously operating the foot pedal, it took longer to stop the machine.

At approximately 2:00 a.m. on November 13, 2000, Richmond was standing between the cooling table and the transfer table. At the time, he was wearing a long, loose-fitting, unzipped coat, in violation of Indalex's safety policies. The area where Richmond was standing when he fell was covered with oil and other debris, making it very slippery. While reaching to push the aluminum, Richmond slipped and fell into an unprotected rotating shaft with a V-shaped notch that was caused by a chip in the flange of one of the couplings on the drive shaft. The spinning shaft tightened Richmond's jacket around Richmond, fracturing several of his ribs and asphyxiating him.

After the accident, the North Carolina Department of Labor, Division of Occupational Safety and Health ("NC OSHA"), investigated the circumstances surrounding Richmond's death. NC OSHA found numerous violations of state and federal law with respect to Indalex's operation of Press No. 1 and its material handling system. Accordingly, NC OSHA fined Indalex $55,225 for these violations. In addi-

---

Plaintiff's *Woodson* claim against Indalex are before the Court on Indalex's Motion for Summary Judgment, and therefore the Court will restate these facts in accordance with the Rule 56 standard.

tion to this fine, NC OSHA had previously fined Indalex for other safety violations at the same facility and also for violations at its facility in Winton, North Carolina, but had not previously fined Indalex for safety problems with Press No. 1 and its material handling system.

As a result of Richmond's death, on November 12, 2002, Terry Richmond, the administrator of Richmond's estate, filed a wrongful-death action in the Superior Court of Alamance County against Indalex and the Novar Defendants. (Compl.) Pursuant to 28 U.S.C. §§ 1441(a) and 1446, Defendants removed the matter to this Court on the basis of diversity jurisdiction because Plaintiff is a resident of North Carolina, Indalex is incorporated in Delaware and has its principal place of business in Illinois, Novar Inc. is incorporated in Delaware and has its principal place of business in Texas, and Novar plc is incorporated in the United Kingdom and has its principal place of business in Great Britain. (Notice Removal [Document # 1] at 1.) Because there is diversity of citizenship and the amount in controversy, exclusive of interest and costs, is greater than $75,000, this matter is properly before this Court. See 28 U.S.C. § 1332(a).

## II. DEFENDANTS' MOTION TO STRIKE

The Court will first consider Defendants' Motion to Strike, since it bears on what will comprise the record which the Court may look to in ruling on Novar's Motion to Dismiss and Defendants' Motion for Summary Judgment. Defendants' Motion to Strike moves this Court to strike Plaintiff's Response to Defendant Indalex's Suggestion of Subsequently Decided Authority and Addendum to Plaintiff's Brief in Opposition (hereinafter "Response to Defendants' Suggestion of Subsequently Decided Authority") [Document # 53]. Defendants also move this Court to award them fees and costs incurred in filing the Motion to Strike. (Mot. Strike at 3.) The Court notes that on November 7, 2003, the North Carolina Supreme Court issued its opinion in the case of *Whitaker v. Town of Scotland Neck*, 357 N.C. 552, —— S.E.2d —— (2003), which, as discussed more fully in Section IV.B below, is directly relevant to Plaintiff's *Woodson* claim. Therefore, on November 12, 2003, Defendants, pursuant to Local Rule 7.3(i), submitted a Suggestion of Subsequently Decided Authority [Document # 52] notifying the Court of the *Whitaker* decision. On November 20, 2003, Plaintiff responded by filing his Response to Defendants' Suggestion of Subsequently Decided Authority.

Defendants move this Court to strike Plaintiff's Response to Defendants' Suggestion of Subsequently Decided Authority because it is not permitted by the Federal Rules of Civil Procedure or by the Local Rules of this district. The Court notes that Local Rule 7.3(i) governs the manner in which parties may alert the Court to relevant new case law that affects the matter before the Court. Local Rule 7.3(i) states that "a suggestion of subsequently decided controlling authority, without argument, may be filed at any time prior to the court's ruling and shall contain only the citation to the case relied upon, if published, or a copy of the opinion if the case is unpublished." Defendants contend that Plaintiff's Response to Defendants' Suggestion of Subsequently Decided Authority violates this rule because "Local Rule 7.3(i) contains no provision whatsoever permitting a response of any kind to a suggestion of subsequently decided authority." (Mot. Strike at 2.) Defendants further contend that Plaintiff's filing violates Local Rule 56.1(d), which the Court notes governs the form and number of briefs parties may file in connection with a summary judgment motion. (*Id.*) As this Court has recently held in *Gallimore v.*

*Newman Machine Co.*, 301 F.Supp.2d 431 (M.D.N.C.2004), Local Rule 56.1(d) only permits the filing of three briefs with respect to a motion for summary judgment: (1) a brief in support of the motion for summary judgment, (2) a brief in opposition to the motion for summary judgment, and (3) a reply to the brief in opposition to the motion for summary judgment. *Id.* at 439.

The Court agrees with Defendants' arguments and finds that Plaintiff's Response to Defendants' Suggestion of Subsequently Decided Authority violates Local Rules 7.3(i) and 56.1(d). Local Rule 7.3(i) does not allow a party to respond to the opposing party's suggestion of subsequently decided authority. Further, Local Rule 56.1(d) does not permit a party to add an addendum to his brief merely because new law relevant to the matter before the Court has become available. For the foregoing reasons, therefore, the Court finds that Plaintiff's Response to Defendants' Suggestion of Subsequently Decided Authority is not permitted by either the Federal Rules of Civil Procedure or the Local Rules of this district. Therefore, the Court will grant Defendants' Motion to Strike this filing from the record. In its discretion, however, the Court declines to award to Defendants any attorney's fees or costs they may have incurred in filing their Motion to Strike.

■ The Court further notes, however, that Defendants' Suggestion of Subsequently Decided Authority [Document # 52] also exceeds the scope of Local Rule 7.3(i). As discussed above, Local Rule 7.3(i) expressly states that a suggestion of subsequently decided authority "shall contain only the citation to the case relied upon, if published, or a copy of the opinion if the case is unpublished." In their Suggestion of Subsequently Decided Authority, however, Defendants have engaged in a discussion of the implications to the pres-

ent case of the North Carolina Supreme Court's decision in *Whitaker v. Town of Scotland Neck.* Such argument is forbidden by Local Rule 7.3(i). Therefore, the Court will strike from the record all portions of Defendants' Suggestion of Subsequently Decided Authority that do not comply with Local Rule 7.3(i). Having disposed of Defendants' Motion to Strike, the Court will turn first to the Motion to Dismiss filed by the Novar Defendants and then to the Motion for Summary Judgment subsequently filed by all Defendants.

## III. NOVAR'S MOTION TO DISMISS

### A. Motion to Dismiss Standard

With respect to a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, dismissals are allowed "only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). Generally, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002) (internal quotations omitted); *accord Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994). Thus, the purpose of a motion to dismiss is to test the legal sufficiency of the complaint and not the facts that support it. *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Revene v. Charles*

*County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989) (internal quotations omitted).

### B. Plaintiff's Claims Against Novar Inc. and Novar plc

In his Complaint, Plaintiff contends that Novar Inc. and Novar plc are parent companies of Indalex. Plaintiff therefore alleges two causes of action against the Novar Defendants. The first cause of action is based on a theory of derivative liability, that is, Plaintiff claims that Novar is liable for Richmond's death to the extent that Indalex is liable. (Pl.'s Br. Opp. Novar's Mot. Dismiss [Document # 30] at 8–12.) The second cause of action is based on a theory of independent negligence, that is, Plaintiff claims that Novar was independently negligent and its negligence was the proximate cause of Richmond's death. (*Id.* at 12–13.) Novar contends that both claims against it fail as a matter of law. The Court will therefore deal with each of Plaintiff's claims in turn.

#### 1. Plaintiff's Claim That Novar Is Derivatively Liable for Indalex's Conduct

Plaintiff's first claim against Novar is based on the theory that, under North Carolina law, Novar is derivatively liable for Indalex's conduct because Novar Inc. and Novar plc are parent companies of Indalex and Plaintiff has alleged facts sufficient to pierce Indalex's corporate veil and thereby extend liability to Novar. Novar contends, however, that under North Carolina law, Plaintiff has failed to allege any facts that justify piercing the corporate veil. (Br. Supp. Novar's Mot. Dismiss [Document # 19] at 6.) In summary, therefore, Novar contends that even if Plaintiff could show that Indalex is lia-

ble, Plaintiff still cannot impute liability to Novar for Indalex's actions.

Plaintiff contends that the following allegations in his Complaint are sufficient to pierce Indalex's corporate veil:

9. That on November 13, 2000, defendant Novar PLC and/or Novar, Inc. owned, controlled and operated such subsidiaries as Indalex Aluminum Solutions Group and shared joint ownership, possession, management and control over the facilities, equipment and operation of the Indalex Aluminum Solutions Group and it [sic] subsidiary companies, including defendant Indalex, Inc. and their manufacturing and operational facilities within the United States and North Carolina, including the operational and safety policies and procedures of such facilities.[2]

46. That Novar PLC and Novar, Inc. were negligent in their management, operation and oversight [sic] their subsidiaries, including the Burlington facility, as follows:

 (a) failing to properly establish and maintain safety guidelines and procedures for the safe operation of their subsidiary facilities, including the Burlington facility,

 (b) failing to monitor and supervise the safety practices and procedures of their subsidiary facilities to ensure they conformed with the safety regulations and procedures required by the Occupational and Safety Health Administration and federal law.

 (c) permitting the operation of the Burlington facility, including Press No. 1[sic] in an unsafe manner in

---

**2.** The Court notes that Plaintiff's Complaint contains a number of paragraphs substantially similar to paragraph 9, that is, paragraphs that discuss Novar's control over various sub-

sidiary entities. Because these paragraphs do not add any more to this matter than what Plaintiff set out in paragraph 9, the Court has only referenced paragraph 9 in its Opinion.

violation of the Occupational and Safety Health Administration regulations and federal law.

■■■ The Court notes that, with respect to their arguments regarding veil piercing, both parties rely on the seminal North Carolina case of *Glenn v. Wagner*, 313 N.C. 450, 329 S.E.2d 326 (1985). In *Glenn*, the North Carolina Supreme Court held that North Carolina courts "will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity", whenever necessary to prevent fraud or to achieve equity. *Id.* at 454, 329 S.E.2d at 330. North Carolina courts will disregard the corporate veil under what is known as the "instrumentality," or "mere instrumentality," rule. *See id.* Under this rule, "[a] corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded." *Id.* (quoting *B–W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8, 149 S.E.2d 570, 575 (1966)) (internal quotation marks omitted). The court in *Glenn* restated the three elements that permit piercing the corporate veil under the mere instrumentality rule:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 454–55, 329 S.E.2d at 330. The court in *Glenn* further noted several factors that may be relevant in determining whether a corporation is so dominated by its shareholder(s) that there is sufficient control to satisfy the first element of the instrumentality rule articulated above: (1) "inadequate capitalization"; (2) failure to comply with corporate formalities; (3) "[c]omplete domination and control of the corporation so that it has no independent identity"; (4) "excessive fragmentation of a single enterprise into separate corporations"; (5) "non-payment of dividends"; (6) "insolvency"; (7) "siphoning of funds by the dominant shareholder"; (8) "non-functioning of other officers or directors"; and (9) "absence of corporate records." *Id.* at 455, 458, 329 S.E.2d at 330–31, 332. The court emphasized, however, that these are merely factors to be considered, not an exhaustive checklist for deciding whether to pierce the corporate veil. *Id.* at 458, 329 S.E.2d at 332. In addition, the court in *Glenn v. Wagner* stressed that the mere instrumentality rule is an equitable doctrine:

It should be remembered that the theory of liability under the instrumentality rule is an equitable doctrine. Its purpose is to place the burden of the loss upon the party who should be responsible. Focus is upon reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation. It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the

corporate entity attacked had "no separate mind, will or existence of its own" and was therefore the "mere instrumentality or tool" of the dominant corporation.

*Id.,* 313 N.C. at 458, 329 S.E.2d at 332.

In the present case, having reviewed Plaintiff's Complaint, the Court finds that there are no allegations therein that any of the preceding factors are present so as to trigger the application of the first element of the *Glenn v. Wagner* veil-piercing test. Instead, Plaintiff merely alleges that Novar controls Indalex. The Court finds, therefore, that the allegations in Plaintiff's Complaint are insufficient to pierce the corporate veil under North Carolina law. In particular, with respect to the first element of the mere instrumentality rule articulated in *Glenn,* the Court finds that Plaintiff has failed to allege that Novar exercised "complete domination and control" over Indalex so that Indalex "had at the time no separate mind, will or existence of its own." Thus, while Plaintiff may have alleged that Novar exercised control over Indalex, such allegations are insufficient to show that Novar exercised "complete domination and control" over Indalex as that language is defined in *Glenn v. Wagner.* Further, Plaintiff's Complaint contains no allegations that Indalex was a sham corporation. *See, e.g., Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 349 (4th Cir. 1998) (citing *B–W Acceptance Corp. v. Spencer,* 268 N.C. 1, 8, 149 S.E.2d 570, 575 (N.C.1966)) (holding that, under North Carolina law, "[a] corporate parent cannot be held liable for the acts of its subsidiary unless the corporate structure is a sham"); *Austin v. Granite Quarries, USA, Inc.,* No. 1:98CV00455, 1999 U.S. Dist. LEXIS 21384, at *11–13 (M.D.N.C. Dec. 2, 1999); *cf. Postell v. B & D Constr. Co.,* 105 N.C.App. 1, 11–13, 411 S.E.2d 413, 419–20 (1992) (allowing an employee to pierce the corporate veil of his corporate employer where the sole shareholder of the corporation exercised complete control over the corporation, failed to adequately capitalize the corporation, and failed to procure workers' compensation insurance for the corporation). In addition, because Plaintiff has failed to make sufficient allegations that Novar completely dominated and controlled Indalex, Plaintiff has therefore failed to satisfy elements two and three of the mere instrumentality rule as articulated in *Glenn v. Wagner.* Specifically, with respect to element two, Plaintiff has failed to allege that Novar used complete domination and control of Indalex in order to commit an injustice, that is, Plaintiff has failed to allege that Novar exercised total control over Indalex and used such control to avoid liability for workplace injuries. With respect to element three, Plaintiff has further failed to allege that Novar exercised total control and that such control was the proximate cause of Plaintiff's death.

The Court notes that the holding of the North Carolina Court of Appeals in *Becker v. Graber Builders, Inc.,* 149 N.C.App. 787, 561 S.E.2d 905 (2002), is instructive as to the issue before the Court. In *Becker,* the plaintiff entered into a contract with Graber Builders, Inc. ("Graber Builders"), controlled by its sole shareholder Dwight E. Graber ("Graber"), to build a house. *Id.* at 788, 561 S.E.2d at 907. As part of its contract with the plaintiff, Graber Builders was required to install an adequate septic system, which it failed to do, in violation of North Carolina law. *Id.* at 788–89, 561 S.E.2d at 907. Sometime after the plaintiff had entered into the contract with Graber Builders, Graber Builders was administratively dissolved. *Id.* at 788, 561 S.E.2d at 907. Plaintiff did not discover Graber Builders' failure to install an adequate septic system until over a year later when she sought to sell the house. *Id.* at 789, 561 S.E.2d at 907. The court of ap-

peals found the allegations in the plaintiff's complaint sufficient to pierce Graber Builders' corporate veil because the plaintiff alleged that Graber "(1) exercised 'complete domination and control' over Graber Builders, Inc.; (2) that such control was used to violate the North Carolina Building Code and commit fraud against defendant; and (3) that the aforesaid control and the violation of the Code proximately caused damages to plaintiff in that she was required to install a new septic system." *Id.* at 791, 561 S.E.2d at 908–09.

With respect to the issue of piercing the corporate veil, *Becker* is distinguishable from the present case. In the present case, Plaintiff has failed to allege that Novar exercised "complete 'domination and control'" over Indalex. Further, although not explicitly discussed by the court of appeals in *Becker,* the allegations in *Becker* demonstrated that Graber Builders was a sham corporation. Therefore, the equitable nature of the mere instrumentality rule demanded that the plaintiff in *Becker* be allowed to pierce the corporate veil. To prevent the plaintiff from extending liability to Graber under the circumstances of her case would have worked a substantial injustice to the plaintiff by in effect shielding Graber from liability for his tortious conduct. In the present case, there are no allegations in Plaintiff's Complaint indicating that such a result would occur here if the Court were to deny his veil-piercing claim. Therefore, while the plaintiff's allegations in *Becker* showed that Graber "exercised 'complete domination and control'" over Graber Builders, in the present case there are no allegations that Novar completely dominated Indalex or that Novar used Indalex as a mere tool.

In summary, therefore, Plaintiff's bare allegations of control are insufficient to allow Plaintiff to pierce Indalex's corporate veil so as to extend derivative liability to Novar. Here there are no allegations that

Novar has abused its corporate privilege or that the Court should disregard Indalex's corporate form to prevent an injustice to Plaintiff. In addition, Plaintiff has failed to allege that Novar completely dominated Indalex, much less any facts that would support such an allegation. For the foregoing reasons, therefore, Plaintiff's allegations are insufficient to pierce Indalex's corporate veil under North Carolina law in order to reach Novar.

Furthermore, while the parties have not raised the issue, the Court notes that there is some question whether North Carolina law should even apply to determine whether Plaintiff may pierce Indalex's corporate veil. In *Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F.Supp. 345 (M.D.N.C. 1995), the court found that, given the opportunity, the North Carolina Supreme Court would apply the law of the state of incorporation to determine whether a defendant could pierce the corporate veil. *Id.* at 348–49. In the present case, Indalex is incorporated in Delaware (Notice Removal at 1), and if this Court were to find that the rationale of *Dassault* applied to the present case, the Court would be required to apply Delaware, not North Carolina, law to determine whether Plaintiff's Complaint is sufficient to pierce Indalex's corporate veil.

However, the Court need not decide whether *Dassault,* a contract case, would apply to the present case, a *Woodson* case, because even assuming Delaware law would apply, Plaintiff's veil-piercing claim would also fail under Delaware law. Based on a review of Delaware law, the Court finds that piercing the corporate veil under Delaware law is at least as difficult as piercing the corporate veil under North Carolina law. Therefore, Plaintiff's bare allegations of Novar's control over Indalex would also be insufficient to pierce the corporate veil under Delaware law. To

pierce Indalex's corporate veil under Delaware law, Plaintiff must allege facts that demonstrate Novar's "complete domination and control" of Indalex. *See Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del.Ch. 1999). "The degree of control required to pierce the veil is exclusive domination and control ... to the point that [Indalex] no longer ha[s] legal or independent significance of [its] own." *Id.* (first, third & fourth alterations in original) (internal quotations omitted). Thus, "[t]o state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del.2003). "Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'" *Wallace*, 752 A.2d at 1184 (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del.Super.1996)). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.* As the district court in *Sears, Roebuck & Co. v. Sears plc*, 744 F.Supp. 1297 (D.Del.1990), explained, "the alleged fraud or inequity must be distinct from the tort alleged in the complaint." *Id.* at 1305. As the court had earlier explained, "[a]ny breach of contract and any tort—such as patent infringement—is, in some sense, an injustice.... The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D.Del.1989). In summary, therefore, Plaintiff's veil-piercing claim fails under Delaware law for the same reasons that it fails under North Carolina law, that is, Plaintiff has failed to allege that Novar exercised "complete domination and control" over Indalex and used such control to commit a fraud or injustice.

For the foregoing reasons, therefore, Plaintiff's Complaint is insufficient to support piercing Indalex's corporate veil under either North Carolina or Delaware law. The Court will therefore grant Novar's Motion to Dismiss Richmond's claims against Novar to the extent those claims are based on a theory of derivative liability.

### 2. Plaintiff's Claim That Novar Is Directly Liable for Its Independent Negligence

 In addition to Plaintiff's veil-piercing claim against the Novar Defendants, which the Court has dismissed, Plaintiff also alleges that the Novar Defendants were independently negligent and their negligence was a proximate cause of Richmond's death. Unlike his derivative-liability claim against Novar, Plaintiff thus alternatively claims that Indalex is not Novar's alter ego. Under this alternative claim, Plaintiff contends that Novar is not protected by the exclusivity provisions of the Workers' Compensation Act and that Plaintiff can therefore assert an independent negligence claim against Novar. As discussed above, the Court notes that the Workers' Compensation Act provides the exclusive remedy for employees who are injured or killed because of their employers' negligence. Based upon the allegations in Plaintiff's Complaint, however, the Court notes that Plaintiff has alternatively claimed that Novar was not Richmond's employer. (*See* Compl. ¶ 17 (stating that Richmond was employed by Indalex).) Therefore, based upon these allegations, under *Phillips v. Stowe Mills, Inc.*, 5 N.C.App. 150, 154, 167 S.E.2d 817, 820 (1969), the Court finds that the exclusivity provisions of the Act would not prevent

Plaintiff from asserting a negligence claim against Novar.

 To maintain a negligence action against Novar, however, Plaintiff must first show that Novar owed Richmond a duty of care under North Carolina law. In *Phillips,* the North Carolina Court of Appeals found that the parent company owed the employee of the subsidiary a duty where the parent company was the landlord of the subsidiary company. *Id.* at 154–55, 167 S.E.2d at 820–21. Here, however, Plaintiff has not alleged the presence of a landlord-tenant or other contractual relationship between Novar and Indalex that would cause Novar to owe a duty to Indalex's employees. Plaintiff contends, however, that *Davidson & Jones, Inc. v. County of New Hanover,* 41 N.C.App. 661, 255 S.E.2d 580 (1979), and *Quail Hollow East Condominium Ass'n v. Donald J. Scholz Co.,* 47 N.C.App. 518, 268 S.E.2d 12 (1980), support his argument that paragraphs 9 and 46 of his Complaint, reproduced above, are sufficient to demonstrate that Novar owed a duty of care to Richmond, that Novar negligently breached that duty of care, and that Novar's negligence was a proximate cause of Richmond's death. This Court notes that in *Davidson & Jones,* the North Carolina Court of Appeals reaffirmed the principle articulated in *Council v. Dickerson's, Inc.,* 233 N.C. 472, 64 S.E.2d 551 (1951), that "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence. It is immaterial whether the person acts in his own behalf or under a contract with another." *Id.* at 474–75, 64 S.E.2d at 553. In *Davidson & Jones,* the court of appeals held "that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner." *Davidson & Jones,* 41 N.C.App. at 667, 255 S.E.2d at 584. In *Quail Hollow East Condominium Ass'n,* the court of appeals applied *Davidson & Jones* to another case involving architect negligence and found that an architect could be liable to a homeowners' association even in the absence of privity of contract. *Quail Hollow E. Condominium Ass'n,* 47 N.C.App. at 521–26, 268 S.E.2d at 15–17. The court of appeals noted that, "under certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking." *Id.* at 522, 268 S.E.2d at 15 (citing Restatement (Second) of Torts § 324A (1965); W. Prosser, *Handbook of the Law of Torts* § 93 (4th ed.1971)). Restatement (Second) of Torts section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (1) his failure to exercise reasonable care increases the risk of such harm, or
>
> (2) he has undertaken to perform a duty owed by the other to the third person, or
>
> (3) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Court first notes that the cases cited by Plaintiff apply in the context of

architect liability. Plaintiff, however, has failed to cite any case law whatsoever applying these tort principles in the context of duties of care owed by parent corporations to the employees of their subsidiaries. Novar apparently concedes, however, that, at least under certain circumstances, it could have a duty of reasonable care to Plaintiff. (Reply Br. Supp. Novar's Mot. Dismiss [Document # 32] at 4.) Novar directs the Court to *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655 (6th Cir.1979), and its progeny. In *Boggs*, the Sixth Circuit Court of Appeals, construing Kentucky law, held that "a parent is not immune from tort liability to its subsidiary employees for its own, independent acts of negligence." *Id.* at 663. Novar contends, and the Court agrees, that *Boggs* is the seminal case holding that a parent corporation can be liable to an employee of its subsidiary for the parent's independent acts of negligence. *See Rick v. RLC Corp.*, 535 F.Supp. 39, 44 (E.D.Mich.1981) (describing *Boggs* as "the leading case" in this area). Plaintiff, while relying on *Davidson & Jones* and *Quail Hollow*, apparently does not dispute that *Boggs* and its progeny (which specifically applies *Boggs* and section 324A in the context of negligence claims by employees against their employer's parent companies, as is alleged here) are controlling. Both parties thus focus their arguments on whether Plaintiff's Complaint contains allegations that the Novar Defendants owed an independent

duty of care to Plaintiff, that is, whether Novar undertook affirmative steps to ensure the safety of Indalex employees. Because Plaintiff and Novar both suggest that *Boggs* and its progeny apply to the present matter, the Court will evaluate Plaintiff's claims under this standard.[3] Therefore, the Court's inquiry is centered on whether Novar "enter[ed] upon an active course of conduct" so as to impose a duty on Novar to Richmond. *See Council v. Dickerson's*, 233 N.C. at 474, 64 S.E.2d at 553.

Based on this standard, Novar therefore contends that because Plaintiff has failed to allege that Novar "undertook the duty to prevent injuries to [Indalex's] employees," Plaintiff's claims of direct negligence against Novar fail as a matter of law. (Reply Br. Supp. Novar's Mot. Dismiss at 4–5.) In support of its position, Novar relies in part on *Thompson v. Superior Fireplace Co.*, 931 F.2d 372 (6th Cir.1991). (Br. Supp. Novar's Mot. Dismiss at 7.) This Court notes that in *Thompson*, the Sixth Circuit Court of Appeals, citing *Boggs*, granted the parent company's motion to dismiss the plaintiff's claims of direct negligence against it. The court of appeals reasoned,

> Plaintiff has failed to explain which independent acts of negligence by [the parent company] resulted in her injury. Plaintiff does not assert any independent acts of [the parent company] relat-

---

**3.** In applying *Boggs* and its progeny to this case, however, the Court notes that the North Carolina Supreme Court has never directly ruled on the issue of liability as between parent companies and the employees of their subsidiaries. Further, the only North Carolina Court of Appeals decision addressing the issue is *Phillips v. Stowe Mills, Inc.*, in which the court of appeals found that a duty between a parent and its subsidiaries could be present where the parent was the subsidiary's landlord. Therefore, the court will only assume, for the purposes of this case, that the

North Carolina Supreme Court, if presented with the opportunity, would hold that the general principles of tort liability enunciated in the North Carolina cases of *Council v. Dickerson's, Davidson & Jones,* and *Quail Hollow,* and the specific principles of tort liability as between parent companies and the employees of their subsidiaries enunciated in the *Boggs* line of cases, would be adopted as the law of North Carolina so as to determine whether parent companies owed a duty to ensure the safety of their subsidiaries' employees.

ing to the injury, or even argue that [the parent company] was involved to any extent with the operation of [the subsidiary]. Without such allegations, plaintiff's case appears to be based on derivative liability in which the parent is liable under respondeat superior for the negligence of the subsidiary, a result which was specifically disapproved in [*Boggs* ]. Because plaintiff does not allege any independent acts of [the parent company] which could raise liability questions, the district court's grant of [the parent company's] motion to dismiss is affirmed.

*Thompson,* 931 F.2d at 374–75.

Although the Sixth Circuit Court of Appeals found in favor of the parent company in *Thompson,* the Court notes that in the earlier case of *Gaines v. Excel Industries, Inc.,* 667 F.Supp. 569 (M.D.Tenn.1987), the district court had denied the parent company's motion for summary judgment finding that, under Restatement (Second) of Torts section 324A (1965), the employer had undertaken a duty to render safety services because the evidence showed that it conducted safety tours and audits of the entire facility. *Id.* at 571–73. However, in *Hinkle v. Delavan Industries, Inc.,* 24 F.Supp.2d 819 (W.D.Tenn.1998) (cited by the Novar Defendants), the district court distinguished *Gaines* and granted summary judgment to the parent company. The court restated the rule on parent company liability as follows: "A corporation may be found liable to its subsidiary's employees in tort for independent acts of negligence if it has undertaken the duty to prevent injuries to the subsidiary's employees." *Id.* at 821 (citing *Gaines; Boggs,* 590 F.2d at 663). In *Hinkle,* the plaintiff forecast evidence showing that the parent company "formed a task force to look for ways to reduce accidents and increase safety consciousness . . . ." *Id.* at 822. The district court found that the evidence demonstrated, as a matter of law,

that the task force's primary purpose was to collect information about workplace injuries and to lower workers'-compensation costs. *Id.* at 823. Given this finding, the court held that the parent company "did not become involved in the day-to-day monitoring of safety, nor did it usurp or assume the subsidiaries' responsibility for ensuring safety. In short, the purpose of the task force was to raise the consciousness of the subsidiaries about the high costs related to employee injuries." *Id.* at 822. Accordingly, the district court ruled that although the parent company's actions "may have been potentially helpful to the subsidiaries in bolstering safety protocols, there is no showing that this was their primary purpose." *Id.* The court found that the key difference between *Thompson,* which found no duty on the part of the parent company, and *Gaines,* which found a duty on the part of the parent company, was the "presence or lack of evidence that the parent corporation assumed a duty to ensure safety." *Id.* at 821.

Although not cited by Novar, the First Circuit case of *Muniz v. National Can Corp.,* 737 F.2d 145 (1st Cir.1984), summarizes the above principles and supports a finding that Plaintiff has failed to state a direct negligence claim against Novar. In *Muniz,* the court of appeals held:

An employer has a nondelegable duty to provide for the safety of its employees in the work environment. The parent-shareholder is not responsible for the working conditions of its subsidiary's employees merely on the basis of [the] parent-subsidiary relationship. A parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary. Such an undertaking may be express, as by contract between the parent and the subsid-

iary, or it may be implicit in the conduct of the parent. . . .

Because an employer has a nondelegable duty to provide safe working conditions for its employees, we do not lightly assume that a parent corporation has agreed to accept this responsibility. Neither mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation. To establish such a duty, the subsidiary's employee must show some proof of a positive undertaking by the parent corporation.

*Id.* at 148 (citations omitted) (footnotes omitted).

The Court therefore finds that Plaintiff's allegations that the Novar Defendants assumed a duty of care towards Plaintiff are insufficient as matter of law. The allegations in paragraph 46 of Plaintiff's Complaint (reproduced above) do not support the notion that Novar has assumed the duty to ensure safety at Indalex; instead, these allegations tend to show, if anything, that Novar did not assume the primary responsibility for workplace safety at Indalex. Further, these allegations merely attempt to illustrate how Novar failed to exercise reasonable care, that is, by failing to ensure adequate safety precautions were taken at Indalex. However, these allegations fail to address the threshold question of tort liability, that is, whether Novar even owed a duty of reasonable care to Indalex's employees with respect to workplace safety.

Plaintiff nevertheless argues that the allegations in paragraph 9 of its Complaint "that Defendants Novar plc and Novar, Inc. actively undertook 'control over the facilities, equipment and operation [of Indalex] . . . including the operational and safety policies and procedures' " are sufficient to show that Novar assumed a duty of care towards Plaintiff's employees.

(Pl.'s Br. Opp. Novar's Mot. Dismiss at 12 (quoting Compl. ¶ 9) (second alteration in original).) The Court finds, however, that paragraph 9 contains no allegations of a "positive undertaking" by Novar to ensure the safety of Indalex's employees. *See Muniz,* 737 F.2d at 148; *see also Hinkle,* 24 F.Supp.2d at 821 (holding that there must be "evidence that the parent corporation assumed a duty to ensure safety"). Plaintiff's allegations in paragraph 9 are therefore insufficient, as a matter of law, to show that Novar assumed a legal duty to the safety of Indalex's employees. The Court notes that in *Hinkle,* the district court noted that "[t]he plaintiffs place[d] a great deal of emphasis on the fact that the companies under the [corporate] umbrella are accountable to [the parent], work closely together, and even share numerous board members." *Hinkle,* 24 F.Supp.2d at 821 n. 2. The court concluded, however, that such allegations were insufficient to hold the parent company liable under a theory of independent negligence. *Id.* Here, Plaintiff's allegations in paragraph 9 are similar to the allegations that the *Hinkle* court found to be irrelevant to independent-negligence claims by an employee against his employer's parent company, that is, Plaintiff's allegations in paragraph 9 tend to show that Novar and Indalex "work[ed] closely together," *Hinkle,* 24 F.Supp.2d at 821 n. 2, not that Novar "ha[d] undertaken the duty to prevent injuries to [Indalex's] employees." *Id.* at 821.

Further, while Plaintiff's allegations might also tend to show that Novar was concerned about safety at Indalex or that it even promulgated safety procedures that Indalex was supposed to implement, such allegations are still insufficient as a matter of law to show that Novar entered upon an active course of conduct to ensure the safety of Indalex's employees so as to create an independent claim of negligence against

Novar. *See, e.g., Muniz,* 737 F.2d at 148 (holding that "[n]either mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation"). In summary, Plaintiff's Complaint fails to allege that Novar usurped Indalex's responsibility for the safety of Indalex's employees. *See, e.g., Hinkle,* 24 F.Supp.2d at 822. The Court will therefore grant Novar's Motion to Dismiss Plaintiff's independent-negligence claim against Novar.

For the foregoing reasons, therefore, the Court will grant Novar's Motion to Dismiss in all respects. All of Plaintiff's claims against the Novar Defendants are therefore dismissed with prejudice. Having considered Novar's Motion to Dismiss, therefore, the Court will now consider the Motion for Summary Judgment filed by all Defendants.

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In Defendants' Motion for Summary Judgment, both Indalex and the Novar Defendants move this Court for summary judgment with respect to all of Plaintiff's claims. Plaintiff contends, however, that the Novar Defendants refused to participate in discovery until this Court ruled on their Motion to Dismiss and therefore Novar's Motion for Summary Judgment is premature. (Pl.'s Br. Opp. Mot. Summ. J. [Document # 49] at 16.) Plaintiff therefore filed a Motion for Extension of Time to File Response Brief and Supporting Documents with respect to the Novar Defendants (hereinafter "Motion for Extension of Time") [Document # 48]. This Court granted Plaintiff's Motion for Extension of Time with its Order of October 20, 2003 [Document # 50], which allowed Plaintiff an extension of time to respond to Defendants' Motion for Summary Judgment with respect to the Novar Defendants. This extension of time specified

that, once the Court ruled on Novar's Motion to Dismiss, Plaintiff had sixty days to conduct discovery and respond to Novar's Motion for Summary Judgment. Because the Court has granted Novar's Motion to Dismiss in its entirety, however, Novar is no longer a party to this lawsuit and Plaintiff is therefore not entitled to any discovery from Novar. In summary, therefore, the Court, having granted Novar's Motion to Dismiss, will deny Novar's Motion for Summary Judgment as moot and will now consider Indalex's Motion for Summary judgment, which is ripe for adjudication.

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.,* 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue*

*Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992). Once the moving party has met this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Catawba Indian Tribe*, 978 F.2d at 1339. In other words, the nonmoving party must show "more than … some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe*, 978 F.2d at 1339.

### B. Indalex's Motion for Summary Judgment

■ Indalex moves this Court for summary judgment with respect to Plaintiff's claims that Indalex intentionally engaged in conduct that it knew was substantially certain to cause serious injury or death to the decedent, Timothy Richmond, and which did in fact cause Richmond's death. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 9.) Specifically, Plaintiff claims that Indalex knowingly subjected Richmond to hazardous working conditions, that is, the defective Press No. 1, that resulted in Richmond's on-the-job death. (*Id.*) As discussed above, Plaintiff brings his claim pursuant to *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991). In North Carolina, the Workers'

Compensation Act generally requires employees to bring claims against their employers arising out of workplace-related injuries pursuant to the provisions of the Act and thus forbids employees from instituting separate civil suits against their employers. *See* N.C. Gen.Stat. §§ 97–9 & –10.1. In *Woodson v. Rowland*, however, the North Carolina Supreme Court recognized an exception to the exclusivity provisions of the Workers' Compensation Act and thereby allowed civil actions against an employer for situations in which the "employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct …." *Woodson*, 329 N.C. at 340, 407 S.E.2d at 228. In defining "substantial certainty," the North Carolina Court of Appeals later explained that "[s]ubstantial certainty is more than a possibility or substantial probability of serious injury but is less than actual certainty." *Regan v. Amerimark Bldg. Prods., Inc.*, 127 N.C.App. 225, 227, 489 S.E.2d 421, 423 (1997), *aff'd per curiam*, 347 N.C. 665, 496 S.E.2d 378, *reh'g denied*, 348 N.C. 509, 502 S.E.2d 852 (1998). The North Carolina Supreme Court in *Woodson* reasoned that "[s]uch misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act." *Id.* at 341, 407 S.E.2d at 228. Therefore, if the employer's misconduct meets the standard set forth in *Woodson*, the employee may bring both a civil claim and a workers' compensation claim against the employer, although the employee is limited to one recovery. *Id.* at 340–41, 407 S.E.2d at 228.

Thus, the starting point for the Court's consideration of Plaintiff's *Woodson* claim is an examination of the facts of *Woodson* itself. The facts in *Woodson* were particularly egregious. In *Woodson*, Davidson &

Jones, Inc. ("Davidson & Jones") hired Morris Rowland Utility, Inc., ("Rowland Utility"), the decedent's employer, to dig a sewer line. *Id.* at 334, 407 S.E.2d at 225. The day before the accident, both Davidson & Jones and Rowland Utility had employees working on the sewer line in separate trenches. *Id.* at 335, 407 S.E.2d at 225. Davidson & Jones was using a trench box in its trench to prevent its trench from caving in. *Id.* Rowland Utility, however, had not sloped, shored, or braced its trench, nor did it use a trench box to prevent the trench from collapsing. *Id.* Rowland·Utility's failure to take such safety precautions violated the Occupational Health and Safety Act of North Carolina. *Id.* The next day, because Davidson & Jones' crew did not work, Morris Rowland, the president and sole shareholder of Rowland Utility, discussed with his foreman whether they should use Davidson & Jones' trench box in their trench, but they decided not· to. *Id.* Later that morning, one side of the trench collapsed, burying the decedent. *Id.* at 336, 407 S.E.2d at 225. By the time his coemployees could remove him, he was dead. *Id.* at 336, 407 S.E.2d at 226.

In denying summary judgment for Rowland Utility, the North Carolina Supreme Court held that

Morris Rowland's knowledge and prior disregard of dangers associated with trenching; his presence at the site and opportunity to observe the hazards; his direction to proceed without the required safety procedures; [the Davidson & Jones foreman's] experienced opinion that the trench was· unsafe; and [the plaintiff's expert's] scientific soil analysis converge to make plaintiff's evidentiary forecast sufficient to survive Rowland Utility's motion for summary judgment.

*Id.* at 346, 407 S.E.2d at 231–32. The North Carolina Supreme Court further noted that Rowland Utility had been cited four ·times in the preceding six-and-a-half years for violations of safety regulations governing trenching. *Id.* at 335 n. 1, 407 S.E.2d at 225 n. 1. Under these facts, therefore, the North· Carolina Supreme Court held that a reasonable jury could conclude that the decedent's "death was the result of intentional conduct by his employer which the employer knew was substantially certain to cause serious injury or death .'...." *Id.* at 337, 407 S.E.2d at 226.

Since the North Carolina Supreme Court established the *Woodson* exception to the exclusivity provisions of the Workers' Compensation Act, however, no plaintiff has successfully brought a *Woodson* claim. *See Whitaker v. Town of Scotland Neck,* 154 N.C.App. 660, 663, 572 S.E.2d 812, 814 (2002) (stating that "[b]efore this case, no claim has been brought successfully under the *Woodson* exception"), *rev'd,* 357 N.C. 552, —— S.E.2d —— (2003), *reh'g denied,* 358 N.C. 159, 593 S.E.2d 591 (2004). Thus, the North Carolina Supreme Court and the North Carolina Court of Appeals have created an extremely demanding standard for plaintiffs bringing *Woodson* claims. However, in *Whitaker v. Town of Scotland Neck,* the North Carolina Court of Appeals found that the plaintiffs had demonstrated a genuine issue of material fact with respect to their *Woodson* claim. In *Whitaker,* the plaintiffs. sued on behalf of the decedent, who was killed while operating a garbage truck for the Town of Scotland Neck. *Whitaker,* 154 N.C.App. at 660–61, 572 S.E.2d at 812–13. The decedent's death was caused by a defective latching device on the garbage truck that violated North Carolina safety regulations. *Id.* at 661, 572 S.E.2d at 813. Because the latching device was defective, when the garbage-truck crew was lifting a dumpster· into the air to empty it into the truck, the dumpster swung loose and pinned the decedent against the side of the

truck, killing him. *Id.* at 661, 572 S.E.2d at 812–13. Further, there was evidence that a similar incident had occurred three weeks earlier but no one was injured and the town did not repair the defect. *Id.* at 661, 572 S.E.2d at 813. In denying summary judgment, the court of appeals applied a six-factor test it had previously articulated in *Wiggins v. Pelikan, Inc.*, 132 N.C.App. 752, 756–58, 513 S.E.2d 829, 832–33 (1999), to determine that the plaintiffs had demonstrated a genuine issue of material fact that the defendant knew that there was a substantial certainty that an employee would be killed or seriously injured in the manner in which the decedent was killed. *Whitaker,* 154 N.C.App. at 663–64, 572 S.E.2d at 814.

■ The North Carolina Supreme Court granted discretionary review in *Whitaker* and reversed the decision of the court of appeals. *Whitaker,* 357 N.C. at 552, 558. The North Carolina Supreme Court first held that the *Wiggins* six-factor test "misapprehends the narrowness of the substantial certainty standard set forth in *Woodson v. Rowland.*" *Id.* at 555–56. The court therefore "explicitly reject[ed] the *Wiggins* test and rel[ied] solely on the standard originally set out . . . in *Woodson v. Rowland.*" *Id.* at 556. The court explained that a claim under *Woodson* is only cognizable "in the most egregious cases of employer misconduct." *Id.* at 557. For a plaintiff to prevail on a *Woodson* claim, therefore, there must be "uncontroverted evidence of the employer's intentional misconduct" and that "misconduct [must be] substantially certain to lead to the employee's serious injury or death." *Id.* The court noted that in *Woodson,* the hazards were "obvious" and the defendant-employer's president observed them first-hand; the employer's president "disregarded all safety measures"; the employer's president "intentionally placed his employee into a hazardous situation in which experts concluded that" a cave-in was substantially

certain to occur; the defendant was "manifestly indifferent to the health and safety of [its] employees"; the defendant "had been previously cited for multiple, significant violations of safety regulations"; the decedent was "expressly instructed into an obviously hazardous situation"; and the decedent "worked in a deep, narrow trench in which it was impossible for him to escape or avoid injury once the soil around him began to cave in." *Id.* at 557–58. The court further noted that in *Woodson* the defendant "recognized the immediate hazards of his operation and consciously elected to forgo critical safety precautions." *Id.* at 558. After evaluating the facts of *Woodson* and comparing them to the facts before it in *Whitaker,* the court concluded that the plaintiffs in *Whitaker* failed to demonstrate a genuine issue of material fact that the defendants were civilly liable under *Woodson. Id.*

■ In the present case, Plaintiff contends that the evidence, viewed in the light most favorable to Plaintiff, demonstrates a genuine issue of material fact that Indalex knew that there was a substantial certainty that an employee would be killed or seriously injured by Press No. 1. In his Brief in Opposition to Motion for Summary Judgment, Plaintiff relies on the *Wiggins* six-factor test to demonstrate that there is a genuine issue of material fact. As discussed previously, however, the North Carolina Supreme Court has overruled the *Wiggins* test. Therefore, in considering Plaintiff's *Woodson* claim, the Court will evaluate Plaintiff's evidence in light of the North Carolina Supreme Court's recent decision in *Whitaker v. Town of Scotland Neck.* Viewed in the light most favorable to Plaintiff, this evidence demonstrates that several employees before Richmond had been injured while working on Press No. 1 and its material handling system. (Pl.'s Br. Opp. Mot. Summ. J. at 13) (citing

Expert Report of C. Michael Dickinson (hereinafter "Dickinson Report").) Further, the daily maintenance logs indicate that Press No. 1 was in a state of disrepair and Indalex employees had repeatedly informed management that Press No. 1 was in need of maintenance. (*Id.* at 13–14.) Further, Plaintiff's Expert Opinion states that Richmond's "entanglement may have been partly due to the damaged shaft coupling .... This coupling was defective and presented a more severe entanglement hazard than an intact coupling would have ...." (Dickinson Report at 3.) In addition, less than four months before Richmond's death, NC OSHA fined Indalex for its failure to provide a proper guard on a separate piece of equipment at the Burlington Plant (not Press No. 1), which resulted in serious injury to an employee (*id.* at 13), and in August 2001 Indalex had also been fined for safety violations at its Winton plant which resulted in an employee's finger being amputated. (*Id.*) Finally, after Richmond's death, NC OSHA found numerous safety violations related to Press No. 1 and fined Indalex $55,225.

Applying the standard articulated in *Woodson* to the facts of this case, the Court, however, finds, particularly in light of the North Carolina Supreme Court's recent holding in *Whitaker,* that Plaintiff has failed to demonstrate a genuine issue of material fact that Indalex intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death to Plaintiff. While Plaintiff's evidence tends to show that there were safety risks involved in running Press No. 1 in its then-unrepaired condition, there is no evidence that Indalex's management knew that requiring Richmond to operate Press No. 1 in its then-existing condition was substantially certain to cause him serious injury or death. Although the evidence may show that Press No. 1 was in need of repair, Plaintiff proffers no evidence that Indalex was aware that the

drive shaft coupling had a jagged chip in its flange that was substantially certain to catch Plaintiff's coat when Plaintiff slipped and fell. There is also no evidence that prior to Richmond's death that NC OSHA had issued any citations to Indalex with respect to Press No. 1 or its material handling system. Thus, this case is distinguishable from *Woodson,* in which the evidence showed that the company's owner was at the job site, knew the trench was substantially certain to cave in, knew that a cave-in was substantially certain to kill or severely injure the employees working in the trench, but still ordered his employees into the trench.

The present case is therefore more similar to other cases involving accidents that occurred at manufacturing facilities than it is to *Woodson.* For example, in *Pendergrass v. Card Care, Inc.,* 333 N.C. 233, 424 S.E.2d 391 (1993), the North Carolina Supreme Court granted Texfi Industries' motion to dismiss the plaintiff's *Woodson* claim where the plaintiff alleged that he was seriously injured when his arm was caught in a final inspection machine that he was operating. *Id.* at 236, 239–40, 424 S.E.2d at 393, 395. The plaintiff alleged two of his coemployees "were grossly and wantonly negligent" because they designed the final inspection machine he was using without proper guards as required by OSHA regulations and their negligence was imputed to Texfi under *Woodson. Id.* at 238, 239–40, 424 S.E.2d at 394, 395. The North Carolina Supreme Court, however, disagreed. It granted defendant Texfi's motion to dismiss because the allegations did not meet the substantial certainty standard enunciated in *Woodson. Id.* at 239–40, 424 S.E.2d at 395. The court held that even if the coemployees "may have known certain dangerous parts of the machine were unguarded when they instructed [the plaintiff] to work at the machine, we do not believe this supports

an inference that they intended that [the plaintiff] be injured or that they were manifestly indifferent to the consequences of his doing so." *Id.* at 238, 424 S.E.2d at 394.

A similar holding denying a *Woodson* claim was reached in *Rose v. Isenhour Brick & Tile Co.*, 344 N.C. 153, 472 S.E.2d 774 (1996), where an employee was killed while operating a brick-setting machine for his employer, a company that manufactured and distributed brick products. *Id.* at 154, 156, 472 S.E.2d at 775, 776. The decedent was killed when the brick-setting machine's carriage head descended on him, crushing his head and shoulders. *Id.* at 156, 472 S.E.2d at 776. The evidence demonstrated that the decedent's death could have been avoided if the defendant had not bypassed the machine's safety precautions. The evidence also showed that the Occupational Safety and Health Administration had issued serious citations against the defendant relating to NC OSHA's investigation into the decedent's death. *Id.* at 158, 472 S.E.2d at 777. Further, the plaintiff's expert calculated the probability of a serious injury occurring on the brick-setting machine as between 77.3% and 93.1%. *Id.* at 159, 472 S.E.2d at 778. The North Carolina Supreme Court, however, still granted summary judgment to the employer. The court noted that the defendant had not received any previous citations for safety violations on the particular machine the decedent had been operating. *Id.* The court discounted the expert's probability calculations as being refuted because no operator of that brick-setting machine had previously been seriously injured or killed. *Id.* The court further noted that no specific regulations existed requiring the defendant to equip the brick-setting machine's carriage head with safety guards. *Id.* Finally, the court noted that the carriage head made a noise and cast a shadow as it descended, thus warning an operator that it was approaching. *Id.* at 159–60, 472

S.E.2d at 778. In summary, therefore, the North Carolina Supreme Court held that there was no genuine issue of material fact that the "defendant knew its conduct was substantially certain to cause serious injury or death to" the decedent. *Id.* at 159, 472 S.E.2d at 778.

The North Carolina Court of Appeals reached a similar result in *Regan v. Amerimark Building Products, Inc.*, where the plaintiff was seriously injured while working on an assembly line operating what was known as the "coater." *Regan*, 127 N.C.App. at 226, 489 S.E.2d at 423. While cleaning the coater, the plaintiff got his hand stuck and he was pulled into the coater, causing him to receive disabling injuries. *Id.* The court of appeals noted that, viewed in the light most favorable to the plaintiff, the evidence demonstrated "that the employer was aware that the coater was unguarded; the unguarded coater was in violation of OSHA regulations; the employer was in fact cited with an OSHA violation for having no guard on the coater; and the unguarded coater required that the plaintiff clean it manually." *Id.* at 228, 489 S.E.2d at 424. However, the evidence also showed that OSHA had given the employer permission to run the machine while the employer was making repairs to bring the machine into compliance with OSHA regulations. *Id.* Further, there was no evidence that anyone else had been seriously injured while cleaning the coater. *Id.* Under these facts, the North Carolina Court of Appeals held that the trial court correctly granted summary judgment to the employer. *Id.* at 228–29, 489 S.E.2d at 424.

Like the employers in *Pendergrass, Rose,* and *Regan,* Indalex is alleged to have committed safety violations at its manufacturing facility. However, as in those cases, Plaintiff has not shown that Indalex knew that these safety violations

were substantially certain to result in death or serious bodily injury. The evidence does not show that Indalex "violated all safety measures" by having its employees operate Press No. 1. Further, there is no evidence that Indalex had ever received any OSHA safety citations for Press No. 1. *See Rose*, 344 N.C. at 159, 472 S.E.2d at 778 (finding relevant the fact that the "defendant had never been cited for an OSHA violation with respect to either the carriage head or the use of weights and wires on brick-setting machine number three," which the decedent was operating when he was killed). In addition, the evidence does not demonstrate that Indalex was "manifestly indifferent" to the safety of its employees. As the North Carolina Court of Appeals held in *Jones v. Willamette Industries, Inc.*, 120 N.C.App. 591, 463 S.E.2d 294 (1995), "[w]hile much more might have been done to ensure workers' safety, the evidence does not show that [Indalex] engaged in misconduct *knowing* it was substantially certain to cause death or serious injury." *Id.* at 595, 463 S.E.2d at 297.

The Court finds that the facts of this case are therefore more similar to those in the case of *Mitchell v. Perdue Foods, Inc.*, No. 3:93CV00014, slip. op. (M.D.N.C. May 14, 1993), than they are to the facts in *Woodson*. In *Mitchell*, the plaintiff, who worked at a chicken-processing plant, was severely injured by an uncovered moving chain on one of the plant's machines. *Id.* at 1–2. When she was picking up chickens that had fallen on the floor, she placed her hand against the machine and it got caught in the unguarded chain, causing severe, permanent injuries to her hand. *Id.* at 2. Four days before the plaintiff was injured, state inspectors had cited the defendant for failing to have a guard on the very machine that caused plaintiff's injury. *Id.* Based on these allegations, however, the district court granted the defendant's motion for judgment on the pleadings. The

court held that the plaintiff's act of stepping down to pick up the chickens and placing her hand on the chain "was a random act by the plaintiff and not something that the defendant could have known would occur as a substantial certainty." *Id.* at 7. Thus, the court found that the allegations were different from the facts in *Woodson*, where no random acts occurred. *Id.*

Thus, this Court, like the district court in *Mitchell*, finds the facts in the present case are also distinguishable from those in *Woodson*. In this case, while Indalex may have known that placing the tape on the foot pedal, having its employees manually thread the aluminum through the machine, and having a slippery floor around the machine were risky, these facts still do not demonstrate a genuine issue of material fact that Indalex knew that these risks were substantially certain to cause death or serious injury. Indalex could not have known that there was a substantial certainty that Plaintiff would wear a loose coat, slip where he did, have his coat get caught in the machine in the exact place where it did, and be crushed before someone could turn off the machine. While it may have been probable, or even substantially probable, that Indalex's misconduct would result in serious injury or death, to prevail on his *Woodson* claim Plaintiff must show that the misconduct was substantially certain to result in serious injury or death, and Plaintiff has failed to carry this burden. *See Whitaker*, 357 N.C. at 557.

In summary, therefore, while the facts of this case may not "shed a favorable light upon the defendant," *Mitchell*, slip op. at 7, these facts are still readily distinguishable from the egregious facts present in *Woodson*. As the North Carolina Supreme Court held in *Whitaker*, "[t]he *Woodson* exception represents a narrow

holding in a fact-specific case ....." *Whitaker,* 357 N.C. at 557. Even viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff fails to demonstrate a genuine issue of material fact that Indalex's misconduct rises to the level of egregiousness present in *Woodson.* For the foregoing reasons, therefore Defendants' Motion for Summary Judgment is granted with respect to Defendant Indalex.

## V. CONCLUSION

In summary, therefore, Defendants' Motion to Strike [Document # 54] is granted, but the Court will, in its discretion, deny Defendants' request for attorney's fees and costs incurred in filing the Motion to Strike. Further, the Court orders stricken all portions of Defendants' Suggestion of Subsequently Decided Authority [Document # 52] that exceed the scope of Local Rule 7.3(i). In addition, Novar's Motion to Dismiss [Document # 18] is granted in all respects. Defendants' Motion for Summary Judgment [Document # 38] with respect to Plaintiff's claims against the Novar Defendants is therefore denied as moot. Defendants' Motion for Summary Judgment with respect to Plaintiff's claims against Indalex, however, is granted. An Order and Judgment consistent with this Memorandum Opinion shall be filed contemporaneously herewith.

### *ORDER AND JUDGMENT*

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Defendants' Motion to Strike [Document # 54] is GRANTED, except that Defendants' request for attorney's fees and costs associated with Defendants' Motion to Strike is DENIED. IT IS FURTHER ORDERED that all portions of Defendants' Suggestion of Subsequently Decided Authority [Document # 52] that do not comply with Local Rule 7.3(i) be STRICKEN.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendants Novar plc and Novar Inc.'s Motion to Dismiss [Document # 18] is GRANTED in all respects.

Finally, IT IS ORDERED, ADJUDGED, AND DECREED that Defendants' Motion for Summary Judgment [Document # 38] is GRANTED with respect to Indalex Inc., but it is DENIED with respect to Novar plc and Novar Inc because Novar plc and Novar Inc. have been dismissed from this case and thus their Motion for Summary Judgment is rendered moot. Accordingly, Plaintiff's claims against all Defendants are hereby DISMISSED with prejudice.