TAMMY C. EDWARDS, ADMINISTRATRIX OF THE ESTATE OF PAUL ROGER EDWARDS, PLAINTIFF-APPELLANT v. GE LIGHTING SYSTEMS, INC. AND GENERAL ELECTRIC COMPANY, DEFENDANTS-APPELLEES

No. COA09-247

(Filed 3 November 2009)

**Wrongful Death— workplace safety—no showing company voluntarily undertook independent obligation to monitor safety**

The trial court did not err in a wrongful death case by granting summary judgment in favor of defendant GE because there were no allegations of any specific undertaking by GE that would create a genuine issue of material fact that GE went beyond concern or minimal contact about safety matters and assumed the primary responsibility for workplace safety at a GE subsidiary.

Appeal by plaintiff from order entered 10 December 2007 by Judge Mark E. Powell in Henderson County Superior Court. Heard in the Court of Appeals 29 September 2009.

*Michaels & Michaels, P.A., by John A. Michaels, and Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Allan R. Tarleton, for plaintiff-appellant.*

*Smith Moore Leatherwood, L.L.P., by Jonathan A. Berkelhammer, Jeri L. Whitfield and Lisa K. Shortt, for defendant-appellee General Electric Company.*

CALABRIA, Judge.

Tammy C. Edwards, administratrix of the estate of Paul Roger Edwards, ("plaintiff") appeals from an order granting General Electric Company's ("G.E.") motion for summary judgment. We affirm.

## I. Background

Paul Roger Edwards ("Edwards") was an employee of G.E. Lighting Systems, Inc. ("GELS"), a subsidiary of G.E.[1] GELS manufactures industrial lights utilizing a process which requires baking metal parts in annealing ovens with an oxygen-free gas which contains a high concentration of carbon monoxide. The annealing process is classified by G.E. as a "High Risk Operation."

_____

1. GELS and G.E. will henceforth be referred to collectively as "defendants."

EDWARDS v. GE LIGHTING SYS., INC.

[200 N.C. App. 754 (2009)]

GELS has its own environmental health and safety department ("EHS"), which is comprised of an EHS manager and safety team leader, both of whom are further supported by safety teams comprised of plant workers throughout all areas of the GELS facility. EHS operates under a three-tier audit program, consisting of (1) comprehensive compliance self-assessments by the plant; (2) a biannual verification audit conducted by G.E. or another third-party auditor; and (3) global operating reviews. G.E. personnel conducted verification audits in 2001 and 2003. The purpose of these verification audits is to ensure that the self-assessment programs were being properly utilized by G.E.'s subsidiaries.

G.E. was able to monitor the GELS facility through web based safety audit systems. The PowerSuite system ("PowerSuite") is a self-assessment tool comprised of over one hundred "modules" designed to ensure federal regulatory compliance. GELS' EHS employees conduct PowerSuite self-assessments at least once per year using modules selected by G.E. G.E.'s auditors use the results of the PowerSuite self-assessments when they conduct their biannual verification audits. Any deficiencies noted during a PowerSuite self-assessment can be placed in a web based audit tracking system.

The Health & Safety Framework ("HSF") is a subsidiary self-assessment tool used by GELS to ensure that it has management systems in place that will ensure good health and safety programs. HSF helps EHS employees determine whether effective managerial systems are in place in twenty-one general subject areas, including high risk operations. As with PowerSuite, deficiencies discovered during HSF self-assessments may be placed in a web based audit tracking system. On the last HSF self-assessment conducted by GELS before Edwards' death, the GELS plant received a score of 17.89 out of 20 possible points.

Select G.E. safety personnel can access the status of any deficiencies posted in the web based audit tracking system, but ultimately GELS' employees are responsible for implementing corrections and closing out outstanding deficiencies in the audit tracking system. G.E.'s review is typically limited to tracking whether deficiencies inputted in the system are corrected within a specified time frame.

In December 2003, Edwards was employed by GELS as an annealing oven operator in GELS' manufacturing plant located in Hendersonville, North Carolina. On 4 December 2003, while taking a

break behind one of the annealing ovens, Edwards died from carbon monoxide poisoning. An investigation by the North Carolina Department of Labor, Division of Occupational Safety and Health ("NCOSHA") following the accident revealed that equipment involved with the annealing ovens leaked carbon monoxide, which caused Edwards' death. GELS was cited by NCOSHA for a number of "serious" safety violations, but had never been previously cited for NCOSHA violations related to carbon monoxide levels at the plant prior to the death of Edwards.

On 1 September 2005, plaintiff filed a wrongful death action against defendants in Henderson County Superior Court, seeking compensatory and punitive damages. The complaint alleged the following as willful and wanton conduct on the part of defendants: (1) failure to have certain safety precautions and carbon monoxide monitors in place; (2) failure to properly train personnel in the use of the equipment and detection of safety hazards related to the equipment; (3) failure to follow generally accepted safety and maintenance recommendations; and (4) failure to provide effective ventilation.

On 18 May 2007, defendants filed a motion for summary judgment pursuant to N.C. Gen. Stat. § 1A-1, Rule 56 (2007). On 10 December 2007, the trial court entered an order that granted G.E.'s motion for summary judgment.[2] Plaintiff appeals.

## II.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007).

The party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact.

A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount

---

2. GELS' motion for summary judgment was denied by the trial court, but that denial was reversed by this Court in *Edwards v. GE Lighting Sys.*, —— N.C. App. ——, 668 S.E.2d 114 (2008). Therefore, GELS is not a party to this appeal.

an affirmative defense. Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist.

Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial.

*Spaulding v. Honeywell Int'l, Inc.*, 184 N.C. App. 317, 320, 646 S.E.2d 645, 648 (2007) (citation omitted), *disc. rev. denied*, 361 N.C. 696, 654 S.E.2d 482 (2007). We review an order allowing summary judgment *de novo. Id.* at 321, 646 S.E.2d at 648.

### III. Analysis

Plaintiff argues that the trial court erred by granting summary judgment to G.E. because G.E. voluntarily undertook an independent obligation to monitor safety at the GELS plant and then negligently performed that obligation. We disagree.

### A. *Hamby v. Profile Prods., L.L.C.*

It must first be noted that defendants argue they are entitled to immunity under the Workers' Compensation Act via the holding of *Hamby v. Profile Prods., L.L.C.*, 361 N.C. 630, 652 S.E.2d 231 (2007). *Hamby* involved a parent who was also the sole member-manager of its subsidiary limited liability company ("LLC"). *Id.* at 633, 652 S.E.2d at 233. Our Supreme Court conducted a detailed analysis of the role of a member-manager of an LLC and determined that an entity in that role, under Delaware law, was necessarily "conducting the business" of the LLC, and therefore entitled to immunity under the Workers' Compensation Act. *Id.* at 639, 652 S.E.2d at 237. Additionally, the parent in *Hamby* was responsible for all aspects of the subsidiary's business and its involvement with the subsidiary was not limited to involvement with safety. *Id.* at 638, 652 S.E.2d at 236.

In the instant case, GELS is not an LLC and G.E. is not a member-manager. G.E.'s involvement with GELS is not nearly as extensive as the parent in *Hamby*. The holding in *Hamby* specifically depended upon where the parent company as member-manager fit into the framework of an LLC under Delaware law. The detailed factual analysis conducted by the *Hamby* Court does not support the broad holding of *per se* parent company immunity encouraged by defendants.

There is nothing in *Hamby* that could be read to create *per se* immunity for a parent corporation under the Workers' Compensation Act.

### B. The Good Samaritan Doctrine

"In North Carolina, *the employer* owes a non-delegable duty to provide a safe workplace to its employees." *Spaulding*, 184 N.C. App. at 323, 646 S.E.2d at 650. *See also* N.C. Gen. Stat. § 95-129 (1) & (2) (2007). In the instant case, it is undisputed that Edwards was employed by GELS at the time of his death. As an employer, GELS owed a non-delegable duty to provide Edwards with a safe workplace. G.E. was not Edwards' employer and therefore owed him no statutory duty. However, this fact does not end our analysis of G.E.'s potential liability.

This Court has held, "under certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking." *Condominium Assoc. v. Scholz Co.*, 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980) (citations omitted). This holding relies upon the Restatement (Second) of Torts § 324A, also known as the "Good Samaritan" doctrine, which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect[3] (sic) his undertaking, if
>
> (1) his failure to exercise reasonable care increases the risk of such harm, or
>
> (2) he has undertaken to perform a duty owed by the other to the third person, or
>
> (3) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). The threshold question in a Good Samaritan claim is whether G.E. undertook affirmative steps to ensure the safety of GELS employees, creating an inde-

---

3. The word "protect" is apparently a typographical error and was intended to be "perform." *See Hill v. United States Fidelity & Guaranty Co.*, 428 F.2d 112, 115 n.2 (5th Cir. 1970).

pendent duty of care to plaintiff. *Richmond v. Indalex Inc.*, 308 F.Supp.2d 648, 661 (M.D.N.C. 2004).

In *Richmond*, the United States District Court for the Middle District of North Carolina considered the question of whether a parent should be liable for the workplace safety of the employees of its subsidiary under the Good Samaritan doctrine. This Court, in *Spaulding*, adopted the following portion of the *Richmond* opinion, which itself relied upon *Muniz v. National Can Corp.*, 737 F.2d 145, 148 (1st Cir. 1984), to establish a framework for determining whether a parent company undertook affirmative steps to ensure the safety of a subsidiary:

> An employer has a nondelegable duty to provide for the safety of its employees in the work environment. The parent-shareholder is not responsible for the working conditions of its subsidiary's employees merely on the basis of [the] parent-subsidiary relationship. *A parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary. Such an undertaking may be express, as by contract between the parent and the subsidiary, or it may be implicit in the conduct of the parent . . . .*
>
> Because *an employer* has a nondelegable duty to provide safe working conditions for its employees, *we do not lightly assume that a parent corporation has agreed to accept this responsibility.* Neither mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation. To establish such a duty, the subsidiary's employee must show some proof of a positive undertaking by the parent corporation.

*Spaulding*, 184 N.C. App. at 323-24, 646 S.E.2d at 650 (quoting *Richmond*, 308 F.Supp.2d at 662-63). Therefore, in order to overcome summary judgment, plaintiff had the burden of forecasting evidence that G.E. affirmatively undertook to provide a safe working environment at GELS, beyond concern or minimal contact about safety matters. The *Muniz* Court characterized this question as "whether [the] parent corporation [has] assumed primary responsibility for industrial safety at [the] subsidiary corporation's plant." 737 F.2d at 146.

*Muniz* and the courts that have subsequently followed its framework have typically rejected claims of parent liability in this context. In *Muniz*, the parent corporation provided general safety guidelines

to be implemented by local management, which the First Circuit Court of Appeals found amounted to only a mere concern with safety matters. 737 F.2d at 149. In *Spaulding*, this Court held that the parent-member of an LLC did not undertake any affirmative duty to provide a safe workplace for the LLC's employees by entering into an operating agreement for the LLC's plant with other members of the LLC. 84 N.C. App. at 326, 646 S.E.2d at 651. In *Richmond*, the Court held that allegations that the parent company was concerned about safety at the subsidiary and that the parent company promulgated safety procedures that the subsidiary was supposed to implement were insufficient as a matter of law to create an independent claim of negligence against the parent. 308 F.Supp.2d at 663. *See also Bujol v. Entergy Servs., Inc.*, 922 So.2d 1113 (La. 2004) (a parent company providing a technical instruction document to its subsidiaries did not supplant the subsidiary's duty to provide its employees with a reasonable, safe place to work with regard to the specific items referenced in the document); *but see Merrill v. Arch Coal, Inc.*, 118 F.App'x 37 (6th Cir. 2004) (holding that under the *Muniz* standard, a corporation's safety program, safety awards, and general safety guidelines were insufficient to create a duty on the parent's part but also holding that evidence of a more specific undertaking, including inspecting a coal mine's roof problems, offering advice about roof control, and telling the mine manager that the mine's roof was adequate, could lead to the conclusion that defendant assumed a duty to advise and therefore summary judgment was inappropriate).

In the instant case, plaintiff argues that G.E.'s safety audit program was a sufficient affirmative undertaking to create an independent duty to Edwards to provide a safe working environment at GELS. The evidence establishes that G.E. provided safety goals and objectives to GELS along with tools to help GELS implement safety programs. Safety concerns entered into PowerSuite and HSF were entirely the responsibility of GELS' employees to correct. This was true even if the concerns were entered into the audit tracking program by G.E. personnel.

### IV. Conclusion

The biannual verification audits conducted by G.E. personnel were intended to ensure that GELS was utilizing PowerSuite correctly and effectively in light of G.E.'s goals and objectives. These audits were a general review and were not intended to be extensive safety audits of the entire GELS plant. Day-to-day safety at the GELS facility was always the exclusive responsibility of GELS personnel. There are

no allegations of any specific undertaking by G.E. that would create a genuine issue of material fact that G.E. went beyond concern or minimal contact about safety matters and assumed the primary responsibility for workplace safety at GELS. Accordingly, the trial court properly granted summary judgment to G.E.

Affirmed.

Judges WYNN and ELMORE concur.